ACCEPTED
01-13-01068-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/1/2015 5:33:37 PM
CHRISTOPHER PRINE
CLERK

## No. 01-13-01068-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/1/2015 5:33:37 PM
CHRISTOPHER A. PRINE
Clerk

DIAMOND OFFSHORE SERVICES LIMITED AND
DIAMOND OFFSHORE SERVICES COMPANY,
*Appellants*,

**v.**

WILLIE DAVID WILLIAMS,
*Appellee.*

**Appeal from the 164th District Court of Harris County, Texas,
Trial Court Cause 2011-31922**

**APPELLANTS' REPLY IN SUPPORT OF MOTION FOR EN BANC RECONSIDERATION**

ADELE HEDGES,
ATTORNEY AT LAW PLLC
    Adele O. Hedges
    State Bar No. 09368500
    ah@adelehedges.com
2719 Colquitt
Houston, TX  77098
(713) 702-4289

BECK REDDEN LLP
    David M. Gunn
    State Bar No. 08621600
    dgunn@beckredden.com
    Constance H. Pfeiffer
    State Bar No. 24046627
    cpfeiffer@beckredden.com
1221 McKinney, Suite 4500
Houston, TX  77010
(713) 951-3700
(713) 951-3720 (Fax)

COUNSEL FOR APPELLANTS

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS .................................................................................i

INDEX OF AUTHORITIES........................................................................ ii

REPLY IN SUPPORT OF EN BANC RECONSIDERATION ....................................1

I.    The Majority's Holding Blesses Unbridled Discretion.........................1

II.   The En Banc Court Should Explain the Correct Evidentiary
      Analysis. ....................................................................................3

      A.    Admissibility rulings require courts to decide
            relevancy. ...................................................................3

      B.    A Rule 403 balancing requires courts to view visual
            evidence. .....................................................................5

      C.    A Rule 403 balancing is mandatory.............................6

      D.    A Rule 403 balancing must first be conducted by the
            trial court.....................................................................8

      E.    A Rule 403 balancing presumes admissibility, which
            can only be overcome by finding "substantial" risk of
            "unfair prejudice."........................................................8

III.  Visual Evidence Is Equally Admissible in Civil and
      Criminal Cases. ..........................................................................12

IV.   The Arguments Against En Banc Review Are Unpersuasive. ...........15

PRAYER FOR RELIEF.................................................................................17

CERTIFICATE OF SERVICE.........................................................................19

CERTIFICATE OF COMPLIANCE .................................................................20

APPENDIX

      Oral Argument Transcript ................................................... TAB A

# INDEX OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*Bay Area Healthcare Grp., Ltd. v. McShane*,
  239 S.W.3d 231 (Tex. 2007) (per curiam) ...........................................................9

*Brookshire Bros., Ltd. v. Aldridge*,
  438 S.W.3d 9 (Tex. 2014)...................................................................................13

*Castro v. Sebesta*,
  808 S.W.2d 189 (Tex. App.—Houston
  [1st Dist.] 1991, no writ)...............................................................................14, 15

*Flannery v. State*,
  1999 WL 504183 (Tex. App.—Houston
  [1st Dist.] 1999, pet. ref'd) ...............................................................................12

*Flores v. State*,
  915 S.W.2d 651 (Tex. App.—Houston
  [14th Dist.] 1996, pet. ref'd)..............................................................................12

*Gordon v. State*,
  784 S.W.2d 410 (Tex. Crim. App. 1990) .......................................................5, 12

*Huston v. United Parcel Serv., Inc.*,
  434 S.W.3d 630 (Tex. App.—Houston
  [1st Dist.] 2014, pet. denied)..............................................................................17

*Kelly v. State*,
  824 S.W.2d 568 (Tex. Crim. App. 1992)
  (Clinton, J., concurring)........................................................................................3

*Montgomery v. State*,
  810 S.W.2d 372 (Tex. Crim. App. 1990)
  (op. on reh'g) ...................................................................................................3, 8

*Nat'l Freight, Inc. v. Snyder*,
  191 S.W.3d 416 (Tex. App.—Eastland
  2006, no pet.) ......................................................................................................9

*Old Chief v. U.S.*,
  519 U.S. 172 (1997)............................................................................................14

*Parr v. U.S.*,
255 F.2d 86 (5th Cir. 1958) ...........................................................................13, 14

*State v. Mechler*,
153 S.W.3d 435 (Tex. Crim. App. 2005) ...............................................................9

*Sweet v. Pace Membership Warehouse, Inc.*,
795 A.2d 524 (R.I. 2002) .......................................................................................8

*Texas Capital Secs., Inc. v. Sandefer*,
58 S.W.3d 760 (Tex. App.—Houston
[1st Dist.] 2001, pet. denied).................................................................................9

*Williams v. State*,
958 S.W.2d 186 (Tex. Crim. App. 1997) .............................................................12

OTHER AUTHORITIES

Tex. R. Evid.
401.................................................................................................................3, 4, 5
402......................................................................................................................3, 4
403..................................................................................................................*passim*

**REPLY IN SUPPORT OF EN BANC RECONSIDERATION**

This case breaks new ground. The opinion is the first civil decision in Texas to even *discuss* the exclusion of an entire surveillance video. In fact, neither party has found a Texas case—on either side of the docket—affirming exclusion of an entire surveillance video. The Majority Opinion acknowledged that "[n]o Texas case squarely addresses the issue present here—the admissibility of post-accident surveillance videotapes as either substantive or impeachment evidence." Op. 25.

If left undisturbed, this seminal case stands for a jaw-dropping proposition: video surveillance evidence may be excluded if it tends to disprove the opponent's claims.

## I. The Majority's Holding Blesses Unbridled Discretion.

The Majority's core holding is a wholesale invitation for trial courts to exclude proper evidence offered to rebut personal injury plaintiffs' claims of disability, even though such claims are subjectively based and difficult to refute:

> a surveillance video is properly excluded under Rule 403 if the video "create[s] an impression that [a personal injury plaintiff] could engage in physical activity for long periods of time without needing rest and without apparent pain."

Op. 26. The very reason defendants want to use surveillance videos at trial— to prove a plaintiff is exaggerating his physical limitations and inability to work— is the reason the Majority held such videos are excludable as unfairly prejudicial. The holding is a sweeping, unsound basis to exclude highly probative evidence.

Why is it unfairly prejudicial to prove that a plaintiff may be exaggerating? The Majority does not say. Why is it unfair to confront a personal injury plaintiff with visual evidence showing he can operate an excavator, change a monster tire on his lifted truck, and go deer hunting? The Majority does not say.

The Majority upheld a $9.6 million verdict in a herniated disc case, reasoning in part that there is no "binding" authority dictating that surveillance evidence had to be admitted. Op. 26. But "binding" cases are elusive, because evidentiary rulings are inherently fact-driven, and no two cases are exactly alike. The binding authority is in the Rules of Evidence, whose standards provide a legal and analytical framework that should be consistently applied. The analytical framework for this issue should be the same in criminal cases, civil cases, federal cases and Texas cases, because the Rules of Evidence in each forum are the same.

The most troubling repercussion of this case is that the Majority's reasoning will apply virtually any time a defendant seeks to offer a surveillance video at trial. Any plaintiff could argue the video does not depict pain or the use of medication. The Majority Opinion affords limitless discretion for any trial court to exclude any surveillance video, no matter how relevant and appropriate under Rule 403.

Even Williams acknowledges that "discretion has bounds that an appellate court can enforce." Resp. 7. It is the obligation of the appellate courts to ensure that trial court rulings do not exceed the legitimate bounds of discretion. Yet the Majority, far from exercising its oversight duty, blesses unbridled discretion.

2

In *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g), the court held: "The appellate court must measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is to be made." The Majority Opinion represents an unprecedented failure to do so. It allows the discretionary standard of review to swallow all analysis, reaching a conclusion that cannot be reconciled with the facts of this case—or Texas law—on the admissibility of evidence.

## II.  The *En Banc* Court Should Explain the Correct Evidentiary Analysis.

The Rules of Evidence codify the procedure designed to protect the rights of the litigants and the integrity of the judicial process. The Majority Opinion fails to apply the correct analytical framework set forth in these Rules. Its failure creates a sweeping ground for unsanctioned exclusion in future cases.

### A.  Admissibility rulings require courts to decide relevancy.

The admissibility of "any evidence" is "first and foremost a question of relevancy." *Kelly v. State*, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992) (Clinton, J., concurring). When relevancy is disputed, as it was in this case, the starting point should be Rules of Evidence 401 and 402.

In the trial court, Williams primarily argued that the surveillance evidence is not "substantive" proof, as it lacked any relevance to the disputed issues. He insisted that the video is only admissible for impeachment purposes if he denied what it showed. CR66-72; 2RR22-29.

3

The trial court agreed with Williams, ruling that Diamond Offshore "can keep [the video] in your reserve bank for impeachment, and that's it. So, if [Williams] opens the door, then we'll take a look at it." Maj. Op. 15 (quoting 2RR29). Williams maintained on appeal that the evidence was not relevant. Appellee's Br. 22-23.

The Majority declined to address the threshold issue of relevance or whether the video is relevant in this case. It did not even mention Rules 401 or 402.

By contrast, the Dissenting Opinion started with Rules 401 and 402 and reasoned: "Here, video evidence showing Williams performing the types of activities he claims to have been permanently disabled from performing . . . is clearly highly relevant to the extent of the injury he claims to have suffered and the amount of damages appropriate to compensate him for his injuries suffered[.]" Dissenting Op. 6. This foundational premise is absolutely correct.

Declining to decide that the video is substantive and relevant, the Majority ignored the trial court's initial error.[1] It started instead with Rule 403 and conjured a possible basis on which the trial court could have found the video prejudicial. This result is laden with implicit holdings that are dangerous for future cases.

---

[1] The trial court decided the video could only be admissible for impeachment purposes during the pre-trial hearing on its admissibility and adhered to its erroneous relevance ruling when the evidence was reoffered during trial. *E.g.*, 4RR182 ("Ruling stands the same."). Indeed, Williams conceded after the verdict that the exclusionary rulings left open the possibility that the evidence might become relevant only if plaintiff "opened the door" to it and that the trial court properly determined that the video had no "impeachment value." *See* CR319, ¶10. This admission confirms that the ruling was based on a mistaken legal argument about relevance that Williams cannot defend.

4

**B. A Rule 403 balancing requires courts to view visual evidence.**

Evidence is relevant if it has a tendency to make disputed facts more or less probable, which can be decided in the abstract. Tex. R. Evid. 401. Trial courts do not need to view visual evidence to determine relevancy, because relevancy turns on logical inferences between the fact offered and the fact to be proved rather than its probative weight.

Once a Rule 403 objection is lodged, the inquiry changes dramatically. A trial judge cannot simply take at face value the objector's characterizations of probative value as slight or risk of unfair prejudicial as substantial. A trial judge must at least sample the evidence to make these assessments and weigh the competing policies of the rules against each other.

This balancing requires a case-by-case weighing—to be performed by the trial judge by *viewing* the evidence:

> This not to say that any such videotape is per se admissible; a decision must be made by the trial court *after viewing the tape*, whether the probative value of the video is substantial or slight, and in the latter case whether the proffer is made solely to unfairly prejudice or mislead the jury or confuse the issues in the case. *See* Tex. R. Crim. Evid. 403.

*Gordon v. State*, 784 S.W.2d 410, 412 (Tex. Crim. App. 1990) (emphasis added).

## C. A Rule 403 balancing is mandatory.

Notwithstanding well settled authority to the contrary, the Majority Opinion gives license to trial courts to forego a Rule 403 balancing. Without record support, it assumed that a hypothetical balancing was actually conducted by the trial court. Then—without conducting the balancing itself—it surmised a possible basis on which the trial court might have concluded the evidence prejudicial. Maj. Op. 26. In its analysis and holding, the Majority Opinion does not even mention the adjective "*unfair*" to describe any prejudice or discuss how any prejudice "*substantially* outweighs" the video's probative value. *See* Tex. R. Evid. 403.

The Dissenting Opinion correctly identified the flaws in this approach:

> [N]either the trial court nor the majority performed the balancing test required by Rule 403 and applied by these courts in other jurisdictions to determine the admissibility of surveillance videos and by courts in this jurisdiction generally to determine the admissibility of evidence objected to on Rule 403 grounds. . . . I would hold, like those courts, that a trial court that excludes relevant and material evidence without performing this test and making a rational determination that the evidence is unfairly prejudicial abuses its discretion. I therefore deeply disagree with the majority's conclusion that a trial court has absolute discretion to rule a video inadmissible without viewing it or weighing its tendency to persuade a jury on an improper basis such as emotion or bias. The majority merely assumes limitless discretion on the part of the trial court and this appellate court itself to make their own subjective determinations as to whether clearly material surveillance video evidence is admissible without performing the balancing test required by Rule 403 and without even viewing the video. In my view, this is error. . . . The error was compounded by the trial court's failure even to view the video, much less to subject it to the balancing required by Rule 403.

Op. 17-18, 22. The Dissenting Opinion could not be more accurate.

6

Williams contends that appellate courts must "presume" that trial courts view visual evidence and conduct a proper balancing, even in a case like this one where the trial court stated for the record that it had not. Resp. 14. This is the opposite of what Williams argued previously to this Court, where he more candidly admitted that the trial court had not in fact ever viewed the video to conduct a balancing: "Viewing the video was unnecessary because the parties had explained in detail what it showed, and had briefed the Rule 403 issue and orally argued their positions multiple times." Appellee's Br. 19.

There is no basis, on this record, to presume that the trial court conducted a Rule 403 balancing with the benefit of having viewed the video. The trial court assured the parties it would look at the video "*if*" the plaintiff opened the door by denying what it showed: "THE COURT: So, if he opens the door, then we'll take a look at it." 2RR29. But the trial court never determined the door was opened.

That the video was offered multiple times during trial creates no presumptions, because the trial judge abruptly rejected the offer each time. Whenever Diamond offered the video, Williams did not raise any formal objection or cite to a particular rule. He merely responded that nothing was "inconsistent" or "contradicted," or that the witness "admitted" everything. 4RR182, 5RR82, 6RR6 (no objection at all). The trial judge adhered each time to her initial decision that the evidence could be admitted only for impeachment.

7

### D.  A Rule 403 balancing must first be conducted by the trial court.

In this case, there was no exercise of trial court discretion to review. The trial court determined that the video was not relevant and then sidestepped any consideration of whether "unfair prejudice" "substantially outweighed" the video's probative value. The Majority had no authority to "conduct a *de novo* review of the record with a view to making a wholly independent judgment" on this balancing. *Montgomery*, 810 S.W.2d at 392.

Appellate deference leaves this inquiry to the trial court in the first instance. *See Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524, 529 (R.I. 2002) (holding video tapes admissible as substantive evidence and remanding with instructions that trial court may consider other objections, including whether probative value of evidence is substantially outweighed by danger of unfair prejudice). The Majority improperly usurped the trial court's role.

### E.  A Rule 403 balancing presumes admissibility, which can only be overcome by finding "substantial" risk of "unfair prejudice."

Courts presume that relevant evidence is more probative than prejudicial. *Montgomery*, 810 S.W.2d at 389. This presumption puts a heavy thumb on the scale in favor of admitting evidence even where the risk of unfair prejudice outweighs its probative value. Only once a trial court determines that the risk of unfair prejudice "*substantially* outweighs" the probative value does it have discretion to exclude it. Tex. R. Evid. 403.

8

A proper 403 analysis includes four factors:

(1) the probative value of the evidence;

(2) the potential to impress the jury in some irrational yet indelible way;

(3) the time needed to develop the evidence; and

(4) the proponent's need for the evidence.

*State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

In this case, the Majority Opinion never discusses the probative or prejudicial calculus or attempts to measure the trial court's (hypothetical) 403 balancing against any of these factors. *Compare* Diamond Reply Br. 17-24 (providing analysis for each factor). Further, it does not hold that the prejudice the trial court could have found amounted to prejudice that was "unfair." Op. 26.

"Unfair prejudice" is not satisfied merely by evidence that is hurtful or prejudicial. *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). The whole point of evidence is to prejudice the other side. *Id*. Instead, the prevailing definition of "unfair prejudice" in Texas is "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *See Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.); *see also Texas Capital Secs., Inc. v. Sandefer*, 58 S.W.3d 760, 779 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (similar). "Prejudicial" evidence is perfectly legitimate, yet the Majority Opinion glosses over this distinction.

9

The Majority Opinion held the video might have had a "prejudicial effect" because it "created an impression that Williams could engage in physical activity for long periods of time without needing rest and without apparent pain[.]" Op. 26. Its opinion overlooked that the video was time- and date-stamped and that Williams could have supplied more context with testimony:

> [T]he video plainly showed, via time and date-stamps, the exact period of time over which Williams was shown performing the activities he claims he could not perform without pain and difficulty. Williams himself could have addressed the issues of whether he needed pain medication after engaging in the activities depicted in the surveillance video and whether he suffered pain as a result of participating in the activities depicted. Thus, any potential prejudicial effect from showing an edited video could have been minimized.

Dissenting Op. 20-21.

At trial Williams sought to prove he was "laid up" for days if he worked: "Anything he ever goes and tries to do, he pays for it." 5RR100; *see also* 5RR181 ("pays for it later"). Yet the Majority concluded it was prejudicial to show Williams working on consecutive days in a "continuous hour-long video." Op. 26. The Dissenting Opinion correctly recognizes this point is for cross-examination:

> [T]he impression that [Williams] was engaged in continual activity could easily have been dispelled by cross-examining the videographer, if he or she was the sponsoring witness, regarding the length of time the videographer filmed the plaintiff, where edits or cuts in the video were made, and whether and for how long the plaintiff engaged in activity outside the view of the camera. Indeed, Diamond Offshore had its videographer, Don Soutillo, available to testify, and, had the trial court admitted the surveillance video, Williams would have had the opportunity to cross-examine Soutillo concerning the circumstances under which the video was made.

10

Dissenting Op. 20. This reasoning is exactly right.

Williams was permitted (over cumulativeness objections) to call a chorus of friends and family members to echo and bolster his testimony, yet the Majority determined it would be prejudicial for Diamond to challenge their claims about the impacts his injury has had on his life with contrary video evidence. Op. 26. The key error in the Majority's reasoning is that it assumes the truth of Williams's side and holds evidence excludable simply because it contradicts one side's position.

The Majority failed to recognize that showing Williams working in full color—where a jury could evaluate first-hand his agility and ease of movement while operating machinery or changing a tire—was legitimate to refute his claims. That the evidence tended to prove that Williams "could engage in physical activity for long periods of time without needing rest and without apparent pain" (Op. 26) was precisely why it was offered. The Dissenting Opinion is exactly right:

> It is especially hard to see under these circumstances, including the potential for cross-examination, how Williams would have been *unfairly* prejudiced if the jury had been allowed to see the surveillance video. And the mere fact that the video was prejudicial to Williams' account of his permanent disability was not, by itself, grounds for exclusion, for, as the Texas Supreme Court stated in *Bay Area Healthcare Group*, "[T]estimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent."

Dissenting Op. 21. Because the Majority's holding rests on a string of unsound analytical steps, the full Court should explain the proper analytical framework.

11

**III.  Visual Evidence Is Equally Admissible in Civil and Criminal Cases.**

Criminal courts are far ahead of the civil courts in recognizing the importance and general admissibility of visual evidence.  This practical reality makes this Court's holding in a civil case all the more dangerous, because it wrongly implies that visual evidence is subject to exceptional trial court discretion in civil cases.  Such a holding devalues the importance of visual evidence in the truth-seeking function of a trial.

Videotapes are a common evidentiary staple in criminal trials, because "[v]ideos show a more panoramic representation of the physical and forensic evidence, thereby aiding the jury in visualizing the scene." *Flannery v. State*, 1999 WL 504183, at *1 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (citing *Gordon v. State*, 784 S.W.2d 410, 412 (Tex. Crim. App. 1990)).  Videos aid juries in ways that other visual evidence cannot.  *See Flores v. State*, 915 S.W.2d 651, 652 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) ("videotape was not cumulative [of photographs] because it offered a three dimensional perspective.").

Even more clearly, videos can be more helpful to the fact-finder than testimony on the same subject.  The general rule is that a photograph is admissible if verbal testimony as to matters depicted in the photograph is also admissible. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997); *Flannery*, 1999 WL 504183, at *2.

Visual evidence is just as important and uniquely helpful in a civil trial as in a criminal one. Indeed, the Texas Supreme Court extols the virtues of video evidence, recognizing it is qualitatively different from testimony. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 22 (Tex. 2014) ("[A] picture is often worth a thousand words.").

The trial court in this case bought the plaintiff's argument that he could render the video evidence irrelevant (admissible only for impeachment) by admitting he could do the activities the video depicted. This rationale completely misses the mark, highlighting that civil trial judges need guidance from this Court about why visual evidence is admissible even where its contents are conceded.

In a case involving videotapes, the Fifth Circuit explained why a party has the right to prove material facts with evidence of its own choosing even where the facts have been stipulated by his opponent. *See Parr v. U.S.*, 255 F.2d 86, 88 (5th Cir. 1958). There, a criminal defendant offered to stipulate that certain video tapes were lewd and obscene. *Id.* But the Government preferred to prove that fact by showing the films. The Fifth Circuit explained why showing the videos was proper:

> It is a general rule that "A party is not required to accept a judicial admission of his adversary, but may insist on proving the fact." The reason for the rule is to permit a party "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight."

*Id*. (citations omitted).

The United States Supreme Court calls this holding the "familiar, standard rule." *Old Chief v. U.S.*, 519 U.S. 172, 186 (1997). It elaborated at length, explaining that evidence can "tell[] a colorful story with descriptive richness … striking hard just because it shows so much at once." *Id*. at 187. The contrast between a personal injury plaintiff downplaying the activities he can still do and a defendant's surveillance video portraying those activities is especially stark. "[A] naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. *Id.* at 189.

There is good reason why a litigant should not be allowed to stipulate to the contents of visual evidence and thereby exclude it: Some forms of evidence are more enlightening and persuasive than others. Proving up a fact against an adversary is much more forceful than hearing it stipulated to in the abstract. "[A]nd as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Id*. at 187. Juries need to hear—*and see*—all relevant evidence to reach a verdict grounded in truth.

In *Castro v. Sebesta*, 808 S.W.2d 189, 193 (Tex. App.—Houston [1st Dist.] 1991, no writ), this Court recognized these same principles, holding the exclusion of photographs harmful error even though the defendant had stipulated to

14

negligence and gross negligence.  The Court explained how the photographs could have helped the jury to better understand the issues in the case.  *Id.*  The error was harmful because the excluded photographs varied from other photographs that were admitted.  *Id*.  *Castro* applies even more forcefully here, where Diamond was not allowed to show any visual evidence at all.

## IV.  The Arguments Against *En Banc* Review Are Unpersuasive.

Williams rationalizes the outcome in this case with arguments that are not the basis for the Majority's holding.  He contends the video was "selective" and "cut-up", that there was other video footage that he had no ability to offer, and that the video was cumulative.  Resp. 13.  The Majority Opinion is not based on any of these arguments, which were refuted in the briefing, presumably because they were rejected.  *See* Diamond Offshore Reply Br. 7-24.  That Williams resurrects arguments that are not the basis for the Majority's holding further confirms that the Opinion is troubling on its face.

Williams also exaggerates the legal dispute as an all-or-nothing proposition: either surveillance videos must "*always*" be admitted, or trial courts have discretion.  Resp. 3 ("*always*"), 8 ("always"), 9 ("always").  He casts Diamond's position as a categorical rule, Resp. 3, and threatens that agreeing with Diamond would allow admission of "*any* video of a plaintiff in a personal-injury suit." Resp. 9.  The logical flaws in his position are best seen in these overstatements.

15

That video surveillance evidence showing a personal injury plaintiff's physical abilities is highly relevant and not unfairly prejudicial in the vast majority of cases is self-evident. That a balancing test does not yield *per se* results is also self-evident. The Court may find the full briefing and oral argument transcript helpful on these points. *See especially* Reply 4-5; **Tab A** 18 (argument transcript).

Last, Williams says the arguments for en banc review are a "sham" and that Diamond's motion seeks only "error correction." Resp. 7, 9. Not so. The reason this case justifies full Court review is because the Majority failed to correctly apply the Rules of Evidence in a context of first impression, creating a seminal holding that will pave the way for the general exclusion of surveillance videos in civil trials even though these videos are routinely admitted in criminal trials.

Williams cites three criminal cases to claim that "Texas appellate courts have affirmed the exclusion of various types of videos, in criminal cases, relying in part on Rule 403." Resp. 10. These cases are inapposite in that they do not discuss surveillance videos or a balancing of probative value versus the risk of unfair prejudice. Each case turns on a rationale irrelevant to this case. That Williams cannot find a single Texas case excluding an entire surveillance video is proof enough that this case is exceptional. A schism between civil and criminal cases on a common evidentiary ruling is the kind of issue the full Court should address.

Williams urges denial of en banc review because Diamond has not identified "a conflict between any two decisions of this Court." Resp. 1. But he makes no

16

attempt to reconcile the scores of Texas cases discussing the admission of surveillance video at trial with the instant case's exclusionary ruling.

For example, he ignores this Court's *Huston v. UPS* decision, where, assisted by a surveillance video, a jury returned a verdict for the plaintiff that was an order of magnitude lower than in this case. *See Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Moreover, he turns a blind eye to quotidian criminal court practice, where surveillance videos are an evidentiary staple. As a lone outliner, the Majority Opinion creates the very schism Williams denies.

## PRAYER FOR RELIEF

En banc review is needed. The Majority inexplicably departs from a traditional Rule 403 analysis in a high-stakes case on a seminal issue. The opinion is the first civil case in Texas fully addressing the admissibility of a surveillance video, and it parts ways with Texas criminal courts, the Fifth Circuit, and the high courts of several states. Given the stakes, the errors in the analysis, and the significance of this case for future cases, the full Court should grant review.

The judgment should be reversed and remanded for a new trial.

Respectfully submitted,

BECK REDDEN LLP

By:/s/ *Constance H. Pfeiffer*
　　David M. Gunn
　　State Bar No. 08621600
　　dgunn@beckredden.com
　　Constance H. Pfeiffer
　　State Bar No. 24046627
　　cpfeiffer@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

Adele Hedges
ADELE HEDGES, ATTORNEY AT LAW, PLLC
State Bar No. 09368500
ah@adelehedges.com
2719 Colquitt
Houston, TX  77098
(713) 702-4289

**ATTORNEYS FOR APPELLANTS**

18

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2015, a true and correct copy of the above and foregoing Reply in Support of Motion for En Banc Reconsideration was forwarded to all counsel of record by the Electronic Filing Service Provider as follows:

Jeff Oldham
BRACEWELL & GIULIANI, LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002-2770
jeff.oldham@bgllp.com

Michael Patrick Doyle
DOYLE LLP
2402 Dunlavy Street, Suite 200
Houston, TX 77006
mdoyle@doylelawfirm.com

Walter Z. Steinman
LAW OFFICES OF WALTER Z. STEINMAN
400 Greenwood Avenue
Wyncote, PA  19095
wsteinman@steinmanlaw.com

***Counsel for Appellee Willie David Williams***

/s/ Constance H. Pfeiffer
Constance H. Pfeiffer

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 4,410 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4.

2.    This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: <u>December 1, 2015</u>.

<u>*/s/ Constance H. Pfeiffer*</u>
Constance H. Pfeiffer
*Counsel for Appellants*

No. 01-13-01068-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
AT HOUSTON

DIAMOND OFFSHORE SERVICES LIMITED AND
DIAMOND OFFSHORE SERVICES COMPANY,
*Appellants*,

v.

WILLIE DAVID WILLIAMS,
*Appellee.*

Appeal from the 164th District Court of Harris County, Texas,
Trial Court Cause 2011-31922

APPENDIX TO
APPELLANTS' REPLY IN SUPPORT OF MOTION FOR EN BANC RECONSIDERATION

TAB

A    Oral Argument Transcript

# Tab A
## Oral Argument Transcript

## *Diamond Offshore v. Williams*
## November 10, 2014 Oral Argument

R:      Okay. Let us begin. Ms. Pfeiffer, before we start uh let me just ask you, once this opinion is written, what is the trial judge going to do when they are confronted with the idea of letting in a video….um, really, like this one? But then I would like for you to apply that procedure to this set of facts in this video.

P:      Well we believe, your Honor, that the case should be reversed and remanded. And that the trial judge should be able to be *view* the video and make any discretionary rulings in the first instance. But we would suggest that the Court should write its opinion in such a way to confirm that the ground on which the trial court ruled in this case was error. And that to the extent that a 403 objection is lodged again that that would not be a viable ground for excluding the evidence.

R:      But how do we decide as trial judges how that, how to evaluate whether or not that video comes in? Is it substantive, is it impeachment, what is it? And what's the case law that supports what your position is?

P:      Well it's absolutely substantive evidence. This visual evidence comes into cases all the time. We know as an empirical matter that juries believe and remember what they can see more than what they're told.

R:      Okay. Well if that's the case, then why not let in all the day in the life videos? Because it's substantive, that means it's admissible. So how do we… I'm a trial judge. You're going to let in the defense video. I let in the day in the life video.

P:      And they're frequently admitted. And notice…

R:      They're frequently not admitted, too.

P:      Well notice there's a big distinction in the cases that have day in the life videos and surveillance videos. Day in the life videos are generally created in cases of catastrophic injuries where the plaintiff believes that their injuries are so severe that the jury may not be able to relate to the extreme suffering and to the impacts on their life. But those videos do contain a higher risk of being selective and done in a way that could be unfairly prejudicial.

R:     So you're saying they are substantive but because of 403 that they are not going to be admissible.

P:     No, I am saying that they are substantive but that those kinds of videos would have perhaps a greater risk of being unfairly prejudicial. A surveillance video, by contrast, is only offered in cases where the defense believes that the plaintiff is exaggerating their injuries.

R:     One of the problems with your video is though that, how would the other side be able to show what you didn't show? Because evidently the snippets that remained, the other snippets got lost. Is that correct?

P:     No. And I'm really glad you asked because they have absolutely alleged and stated that this video is edited. And all they have is attorney argument citing to attorney argument. And this warrants some discussion, because this is a major theme of their case—that the video is misleading because it's so selectively edited and all we have are snippets."

What the record… First of all, Diamond produced all of the video that it took. We gave them the names of our investigators and we produced the investigative report—detailed reports showing exactly what the investigators did and detailing the video. They had all of this in discovery. They had our representations that they had all of the video. Now if they thought that there was something left out or that they didn't have everything, they could have filed a motion to compel. They didn't do that. They could have deposed the videographer.

R:     A motion to compel what? Because you said that they gave them the entire video.

P:     Right. And if it's their position that they didn't have everything…

R:     Oh I see.

P:     …the proper remedy would have been to file a motion to compel in discovery. They didn't do that. They didn't depose our videographers. And notice in the pre-trial hearing when they are arguing why the video is misleading, they don't tell the trial court that they think this video is edited.

J:      Hold on for a second. It seems to me like we're getting really far afield from what the issue is before this court. There's a standard of review here—abuse of discretion. Your position is the trial court erroneously excluded this particular piece of evidence that y'all were trying to get in front of the jury.

P:      That's right.

J:      And is this particular piece of evidence is an hour and six minutes long?

P:      Yes.

J:      And basically the way I understand this case, from at the trial court level, this was a Rule 403 objection.

P:      No. Well let me clarify. First and foremost, their position was that this only comes in for impeachment purposes…

J:      Let me ask it this way. Was there a Rule 403 objection to this piece of evidence?

P:      Yes.

J:      So if the trial court, under the standard of review, abuse of discretion could have within this reasonable zone of disagreement excluded this piece of evidence then this issue goes away. Correct?

P:      If it's within the zone of discretion.

J:      And your point is, as a matter of law—*as a matter of law*—that the trial court *had* to admit this piece of evidence.

P:      Yes, my position is that it's outside the zone of discretion. And I think the best case—and this I think addresses your question Chief Justice Radack as well—when you ask what standards the trial court needed to apply and what standard does the appellate court, are you applying, the *Montgomery v. State* case from the Court of Criminal Appeals. This is a seminal 403 decision that's been cited in nearly 3,000 times…

J:      Let me ask you a quick point of order here. Rule 403 objection was made. And reading through your brief, your opening brief, there's only one passing reference to Rule 403 on page 48. And then in your reply brief, then you

discuss Court of Criminal Appeals cases, not Texas Supreme Court cases, not civil cases on why this evidence should be included. What is your best authority that as a matter of law the trial court had to let in this video?

P:     There's two responses…

J:     What's your best authority?

P:     First of all, speaking of the briefing, we know from the record in this case that the trial court ruled on impeachment grounds. They did make a 403 objection but the trial court said, "here's what I'm going to do. If he denies anything in the video and you need it for impeachment purposes…"

J:     Of course if any legal ground covers the trial court's decision we can affirm on that basis.

P:     I would respectfully disagree. Now I don't need to win this point but let me clarify because that proposition comes from *State Bar of Texas v. Evans* in footnote 5, where the court says you can affirm an evidentiary ruling on any ground if there is another viable ground. That proposition…

J:     All evidentiary rulings are abuse of discretion, right?

P:     Well that proposition is overbroad because here if a trial court specifies a ground for its ruling and that ground is erroneous, the judgment can only be affirmed if there were another ground on which the trial court *had* to exercise its discretion.

J:     We're going to get into *that ground* but let's take care of the Rule 403 ground first. What is your best authority that as a matter of law the trial court had to let this in under Rule 403?

P:     It's *Montgomery v. State*. And that authority, the Court of Criminal Appeals granted rehearing on its own motion to address the point that trial courts do not get a limited right to be wrong.

J:     Now on your other ground, uh… impeachment, the other side points out in their briefing quite a bit that their client never really said that he was a paraplegic, that he was completely and totally 100% disabled so forth and so on. Uh… what would this evidence have brought forward to impeach him if he's already basically admitted he wasn't totally disabled?

P: Two responses there as well. Let's be really clear that visual evidence doesn't have to have an impeachment purpose. It is first and foremost substantive proof and that's the proposition that I think we have squarely established in our brief. I don't think that they will deny that today. Ask them to concede this…

J: If he's already admitted that he hasn't completely and totally lost the ability to, you know, move around and do some things, what would the purpose of this evidence other than to put a picture to what he has already admitted?

P: Well because a reasonable juror could look at this evidence and have a better understanding of what he can actually do and they can *see*—not just be told that he can still work on an excavator—they can see what that looks like and find…

J: And how is that not cumulative?

P: Well the rule in Texas is visual evidence is *never* cumulative of testimony. So if testimony is admissible on something that visual evidence shows, the visual evidence is also admissible. That is squarely established.

R: What case?

P: Excuse me?

R: What case are you referring to?

P: Uh the *Gordon v. State* case speaks to that. And we've cited multiple cases in our brief. The *Flores v. State* in the Fourteenth Court case also speaks to that. If you have a crime scene and it's relevant to the jury to understand what a crime scene looks like, you can have an eyewitness testify about it. But if you have a photo, that photo is also admissible. And I think this Court's decision in *Castro v. Sebesta*…

J: I'm sorry. What was the best civil case?

P: I would say *Castro v. Sebesta* from this Court. That in that case the court reversed and remanded because twenty-seven photos were excluded from evidence. And the court found that since no other photos introduced showed the same thing, that that was relevant and probative for the jury to see those

photos as well.  Visual evidence comes into cases all the time.  In fact, I just did a search this weekend…

J:     And it's often excluded though, too, under Rule 403?

P:     Well and I'd be *happy* to address Rule 403 but I want to make sure the court has the baseline proposition that this evidence is frequently admitted.

R:     We hear, we hear you on that, but let's hear from the other side now.

P:     Okay.  Thank you your honor.

## Appellee

R:     I bet you don't think it's substantive.

O:     I'm sorry your honor.

R:     I said I bet you don't think it's substantive.

O:     Uh may it please the court.  They offered it as both substantive evidence and impeachment evidence in the motion in limine hearing and said that it can be both.  One point I want to make on that is that we argued this in our brief and I didn't see any response.  Motion in limine points preserve nothing.  So raising it at the motion in limine stage didn't preserve anything.

R:     Is it substantive or not?

O:     Your honor, I think that it *can* be substantive evidence.  The case law evidence suggests that it *can* be substantive evidence to the extent that you know it makes something more likely be true than not.  Um but in this case if you look at where they actually formally offered it into evidence at the trial, they only ever offered it for impeachment.  That's why we focused on it as impeachment.  That's why the trial judge focused on it as impeachment.  Three times they went up to offer it after a witness testified either Williams or Rodriguez and said, "Your honor, we would like to introduce this into evidence because I want to show something that the witness just said."  And each of those times the trial court then said "denied."  So I don't think they even preserved an argument.

J:  What about opposing counsel's point that well because the focus of it at trial was on impeachment and the trial court said this basically on the record that this Court's really limited to looking at that and we don't even get to Rule 403.

O:  Well I don't think the trial judge ever specified a reason for her ground. Initially, in the motion in limine hearing they offered up a substantive evidence and impeachment evidence. We then asserted a number of objections to why it shouldn't be admitted in either. As to impeachment, we said there's no contradiction. As to substantive evidence, we said for Rule 403 they've not laid a proper foundation and a bunch of other reasons. And the judge in saying "I'm not going to let it in…you can have it for impeachment" isn't specifying what reason she denied it. She didn't say …

J:  What, what did the judge say exactly?

O:  The judge said "I'll tell you what if he contradicts what he says then we can have it in as impeachment." That's it. That's not a ground for her decision. She didn't say whether it was for 403. She didn't say whether it was for a lack of foundation.

J:  The judge didn't say on the record "I'm allowing this evidence in because it would be impeachment and we don't need impeachment 'cause he's already admitted." She never said that?

O:  No, she never said that. She said "I'll tell you what" and this was in the motion in limine which again is not really the right time to look at but then she later said it's not coming in because there's been no contradiction. So she never, to the extent that there is a substantive evidentiary offer in this case which we don't think there is because they never offered for that at trial. We don't know the reason the judge did that. It could have been…

J:  Let's say the judge *did* articulate a ground and said just hypothetically. Let's say the judge said "I'm not letting it in because I think it would be improper impeachment because he's already admitted to all of this. And it would be cumulative. Would we be bound by that or would we consider other grounds that would have supported the objection? Legal grounds?

O:  I don't think the court is bound by that. We cited cases in the brief that say the court of appeals can affirm on any ground in the record even if it was not even made below. Not even raised by defendant. Now we don't need to go

*that* far but if the trial court identified the wrong reason but there was a correct reason for excluding it that was raised. Yes, I think absolutely this court can affirm on that ground. And as to impeachment, kinda looking at the two ways in which they offer this into evidence. On impeachment your honors asked a good question about, you know, was there a contradiction and the answer was well no but visual evidence is more powerful. I mean clearly the judge made that judgment call here that there was no contradiction and three times in fact. There's no reason for this court to second guess that decision.

As to substantive evidence, the trial court has at least three reasons to exclude it as I said earlier. One of them is that it was never really offered formally at trial for substantive evidence. It was only offered for impeachment. The other two are Rule 403 and, uh, also the lack of foundation. Under Rule 403, of course the trial court had, you know, ample discretion to decide that the way that this was unduly prejudicial to my client because of the surreptitious type surveillance video and the stigma that that creates just to let jurors watch that. Um in addition to the fact that this was, you know, very misleading in the way that it was put together. It was *highly selective*. Uh, counsel said that we didn't argue below that it was edited but we actually did argue below that it was edited. We said over and over in our brief in the trial brief that, look they've put together this one hour and six minute video that…

J:  When was the video taken in relation to the injury, when the injury occurred, and the surgeries?

O:  So the the uh the injury was on January 7, 2008 and then the video was taken on December I believe it was 18, 19 and 20 or maybe 17, 18, 19 of 2008. So it was almost a year later and it was I believe after he had his first surgery but before the second surgery. It certainly was before the second the more significant surgery. I can't remember as I stand here whether it was before or after the first surgery.

J:  And what… Refresh my memory. What was the second surgery?

O:  I'm sorry.

J:  Refresh my memory. What was the second surgery? Was that a fusion or…

O:    That was the fusion where they removed several discs and put a cage in his back.

J:    They actually did remove discs?

O:    Yes, they removed two discs and put a cage in his back. You know, in place of them it had two inch screws that went into his spine to hold it all together. It was a substantial surgery.

J:    Can I move you into the damages portion of it if we can? Okay? Are we using thirty-five years as a timeframe for his productive work life if he had not been injured?

O:    No, we're not your honor. For his productive…

R:    What number is that?

O:    For his productive work life, the evidence was that, I believe it was nineteen years. Two decades is what McCoin testified it would be.

R:    Okay. I thought he based his calculations on the pre-incident annual salary of $134,000?

O:    That's correct.

R:    So if you divide $134,000 by 2.254 million, can you explain and take me through how that came to be and why that's reasonable?

O:    Well the 2.2 mill well let me just start off by saying…

R:    Future wages?

O:    Yes, future wages for two decades of working and let me just start off by saying that appellants never challenged that. In the trial court…

R:    Never challenged what?

O:    The methodology by McCoin.

R:    Okay but they did say that it was excessive.

O:      They said it was excessive but I think this is true in their briefing and below what they said is that their expert said that they he would have been $38,000/year. And if you do that, then it ends up being a million dollars less. But they've never argued that his methodology was wrong in terms of how 134 works. But certainly there's a lot of factors that goes into how the expert calculated that over the life of his productive work life in terms of you know discount factors and all that. But there's been absolutely no challenge to that. The only issue on the amount of future earnings capacity has been whether he can get a job again. And that's exactly the sort of thing…

R:      I think his own doctor said I mean the company doctor said he couldn't work again because of pain and not being able to sit in a normal work environment.

O:      That's right and also being on narcotics. He needs…

R:      I do want you to answer this question okay because I do have a question about Dr. McCoin based his calculations on 134. So if you divide that is that going to be 19 years?

O:      19 years is what he used in his…

R:      So that's how the jury came up with the 2.24?

O:      Yes according to…

R:      I'm the first to admit I'm not good at math so 19 years times 134 probably around 2.245?

O:      That's yes.

R:      So that's what the jury decided and based on?

O:      That's correct. And the jury took exactly the number that he used and you're right if that number ends up being larger than what they awarded but you have him getting the money all at once. You have discount factors, you have some uncertainty built in to whether he would continue to get $134,000 a year?

R:      Because of raises and things?

O: Yeah. Probably it might go up but who knows what else and so there are all sorts of uncertainty calculations that the expert did to arrive at that number. But the only dispute there is the extra million dollars about whether he could have had a job. And as your honor has pointed out there is plenty of evidence that he could not have a job, and there's disputed evidence but that's exactly what jurors are for.

J: And part of that was because of his need to use painkillers?

O: That's correct. The fact that you know there was really no contest on this. That he would need to be on pain medication to control his pain and there was testimony by Dr. Barrett as well as, you know, Mr. Williams himself that it would be exceedingly difficult for him to get a job when you're not around pain meds and also he sit still. He couldn't sit. He can't stand. You know that that sort of thing.

But I want to go back to the question that you just described. You started with I think is really the right question and a way to look at this case. Which is that what Diamond is asking for in this case is for this court to micromanage trial court evidentiary rulings in a way that would drastically change Texas law. If this court – there's really no way for this court to reverse on this surveillance video issue without creating a *per se* or as Diamond likes to call it a categorical rule that visual evidence is always admissible.

And that's really there's two extreme kind of aspects to this case that make that so. And one is cumulativeness. There is absolutely nothing in the video that the jurors didn't get to hear about in testimony from Williams and the medical evidence and other testimony. The *only* thing they say that's different is the manner of presentation.

R: Well I'm going to agree with you that a motion for limine does not preserve anything but I am going to check to see whether or not the offer was only under impeachment. And Ms. Pfeiffer, I'd like for you to respond to that too.

O: Yeah. And your honor, on two of them it couldn't be clearer that they say you know the witness just said this and I want to put the video on it to show them the difference.

R:    So the comment that the judge made about "I'm putting this so you can reserve it." "I'm putting it in the reserve bank" or whatever or something like that.

O:    Yeah.

R:    That was during the motion in limine.

O:    That was at the motion in limine stage. And then the very first time that it was offered was when Dr. Rodriguez was testifying and after he I think he was asked a question about you know what Mr. Williams can do in getting jobs and the like and then they went up and asked the judge "Judge, we need to put this in so that we can show Mr. Rodriguez he can do x, y, and z activity." I read that as being impeachment. I suppose the argument can be made that was an attempt to put it in as substantive evidence. Just to show the jury and show Mr. Rodriguez, but it's ambiguous. And I think they had to make it very clear objection on the record. It was their burden to make a very clear objection on the record to show that it was for more than impeachment. So I think that's why on that ground that they can't make that argument.

      And I think the third point in addition to not having preserved an argument as to substantive evidence and also Rule 403, a third ground is foundation. You know this video because of how misleading it is and because we had questions about how it got put together there was a lot of contention over this video.

R:    Well the foundation…

O:    And at trial…

R:    Well the foundation, what do you mean by foundation, forgetting the facts for a minute? Are you saying he couldn't the plaintiff couldn't get on there and admit that yes that's me on there? So that's not a proper foundation?

O:    Well he didn't do that though your honor.

R:    I understand because it didn't come in.

O:    Well that's right your honor. But I think that you're correct that if the video came in Mr. Williams could have authenticated it by saying "yes, that's me."

R:      So what do you mean not lay a foundation?

O:      Well in this case I think they needed to make a proffer of the foundation in order to preserve their argument that it should have come in because that was one of the arguments that was made and they didn't do that. All they did and this is at page 11 of Volume VI of the Reporter's Record is they stood up and said "your honor, we would have a videographer come in to authenticate it." And then we, Mr. Williams counsel, stood up and said "well we don't object to your right to make a proffer but there might have been two videographers that might not have been enough." So I mean there was a challenge over whether it was authenticated and it's not enough for a lawyer to get up and say "I would have put on a witness that would have authenticated it." The case… I'm sorry.

J:      Nah. I was just going to ask you a more practical question, but finish your thought.

O:      But the cases made clear that you have to put on the actual substance of your testimony. You can't just say they would have authenticated it. That's sort of a legal conclusion. That's not putting on the substance of what the proffer would have been so that this court can evaluate whether in fact there was a proffer. So that's the only point on foundation.

J:      I just have a question regarding the application of law and criminal v. civil cases. In Diamond's briefing, Diamond relies very much on Court of Criminal Appeals cases in regards to 403 analysis in its reply brief. And of course if you think about it this way in a criminal case of course the State of Texas is the plaintiff and almost inevitably as pointed out in the reply brief this kind of evidence comes in in criminal cases where the state in prosecuting an individual gets to use this type of evidence and almost always comes in. That doesn't mean it *always* comes in under Rule 403.

O:      Right.

J:      Uh the issue is much more litigated on the criminal side for obvious reasons that way. Uh well if that's the law on the criminal side why shouldn't that be the law in the civil side where just go ahead and let all that photographic evidence in. Let it come from the plaintiff or the defense if you've got some kind of photographic evidence that Court of Criminal Appeals is almost

always going to let it in. Why not always let it in on the civil side as a matter of policy?

O: Well it struck me too that the amount of reliance on criminal cases. I mean there certainly is case law saying that the rules of evidence are the same and so we look at them the same. But I think the rule in both sides is that the trial courts need to have discretion. Trial courts need to be able to make that judgment call based upon all the facts and circumstances of the case.

J: But in criminal cases they almost *always* let this evidence in in favor of the prosecution. If that's the case, why not just let *all* the evidence in and let the chips fall where they may and let a fact finder determine it?

O: Well in…

J: What's wrong with a rule that says as Ms. Pfeiffer points out *as a matter of law* this evidence should have come in. What's wrong with a rule that just says let it all in? Let a jury decide.

O: Well there's a number of things wrong with that. Obviously, it would be rewriting Texas law in terms of because, as your honors have pointed out, these videos or day in the life videos are frequently excluded as they're sometimes…

J: The plaintiff would have benefit as much as the defendant if we adopted a rule like that, right?

O: That's absolutely true. And I think that if a rule is such that it always comes in I think the court should just watch out for what's coming next. Because now video evidence is going to come in all the time and if there's no discretion whatsoever for a trial judge to say, "Hang on, time out. This is way more prejudicial." Then I don't think you have any disincentive for litigants to try to find the most prejudicial video they can. Come up with the most skewed depictions they can for day in the life videos. We can all just sort of imagine how out of hand it can get if that's the rule. That always this kind of evidence comes in. And I think if you take it that far that visual evidence is so much more powerful than the written word, I mean that could also go outside of the context of other areas where lawyers might want to say that they, you know, get to take up on appeal, you know, video of their excluded testimony because that's much better than just the written word. I think it would be a very dangerous rule.

R: Thank you.

O: Thank you your honor.

## Rebuttal

R: You have yet to show that this video would have made a difference. What was the harm in excluding that? I watched the three hours of it. You know what was there? What was on that? What was on that particular piece of video that made such a difference?

P: There's a *lot* of reasons this was harmful but one of the best I think is with respect to the Functional Capacity Evaluation (DX28) attached to our reply brief. That's the document where a third party investigated and tested Williams and concluded that he's capable of medium level work and that his answers to the Oswestry Pain Questionnaire reflected that he was exaggerating.

R: But that came in.

P: It came in but here's what happened. As the plaintiff had their vocational expert say "well that test is old and it's been superseded by more recent medical opinions."

R: Your doctor said he couldn't work. *Your* doctor said he couldn't work.

P: That's inaccurate your honor.

R: Dr. Barrett is not your doctor?

P: No, he's the treating doctor. And here's what's so key about Dr. Barrett…

R: Who's your doctor?

P: Our doctor is Dr. Cenac.

R: Okay but didn't Barrett didn't he report to Barrett as a part of his injury and required by Diamond? How did the plaintiff end up at Dr. Barrett's office?

P: Well Dr. Barrett was the treating doctor.

R:      I know but why?

P:      Well he was who the plaintiff saw when he was…

R:      Just one he picked?  That's not a company doctor?

P:      Oh I see what you're asking.  I think that Diamond may have recommended him, but he had treated the plaintiff for years and who did the surgeries.  But notice…

R:      2006 you mean?  Was he the 2006 doctor?

P:      No, no.  He's the 2008 doctor.  But notice that at trial when he testifies that he can no longer work that the deposition they're reading into the record

R:      That *he* testified– are you talking about Dr. Barrett or Mr. Williams?  I'm sorry.

P:      Uh Dr. Barrett.  They read into the record a deposition taken before the surveillance video so we don't get to point out that the surveillance video called that opinion into doubt and also corrobates the Functional Capacity Evaluation.

J:      Now…

P:      Justice Jennings, I did want to clarify in response to your question about matter of law.  It is our position that this comes in that there was no basis to exclude it *in this case*.  It's obviously a case by case determination and your point is a good one that in criminal cases the rules are the same.

J:      Oh no.  We let in autopsy photographs in criminal cases and the relevance escapes me when you already know it.  But on the criminal side, we let in everything.  The plaintiff wins everything.  Uh so my concern is that if we were to do that in civil cases I mean what's good for the goose is good for the gander, right?

P:      Right.

J:      It it comes in, it comes in on both sides.

P: I think that this will by and large virtually always come in. Except in cases where you could prove…if they could prove that this had been manipulated and tampered with and that it was not an accurate portrayal of the facts, perhaps it doesn't come in.

J: Well let's talk about Chief Justice Radack mentioned harm and within your briefing you do have photographs, still frames from that video itself, and I'm assuming that these are because you put them in your brief they are the most important parts of the video because they're in your brief.

P: Well they're exemplary, sure.

J: And I just kinda flipping through here, you have got one where it looks like he's sitting in a backhoe operating a backhoe.

Another where it looks like he's looking into a garbage bin.

Another where it looks like he's walking to the garbage bin carrying something.

Another where he's kinda sitting on rope or something and another where he's throwing a piece of an item into a garbage bin.

And then you do have the frame where apparently he is squatting working a tire or the tire area of a truck and it looks like he did that for roughly five minutes or a little bit more than four or five minutes. So and then he's carrying a large heavy item.

So out of this hour and six minute video you've got these photographs. I'm having a hard time seeing how *as a matter of law*…this kind of evidence comes in especially when you consider the *timing* of the video which was taken I guess after the first surgery but before the second more serious surgery.

P: Well it comes in because…

J: There seems to be a lot of factors in here that could have been going through the trial court's mind in excluding this evidence.

P: Well let …

J:      And one of them could have been timing.

P:      Let's be really clear:  It comes in because it's relevant and they don't have a valid objection for keeping it out.  And I'm not saying that it comes in as a matter of law in every single case.

J:      You're saying Rule 403 is not a valid objection?

P:      Not in *this* case.  And I would like to make sure the record is clear on the grounds…

J:      Based on these photographs that you've got in your brief and I'm assuming are the worst of the worst, you're saying *as a matter of law* in this case the trial court erred under Rule 403 in excluding them.

P:      I *am* saying that.  And there's portions of the video where you can't capture the relevance…

J:      We've seen the video.  Yeah we've watched it.

P:      You can't capture the full probativeness from still shots because when you see the video you see a portion where…

J:      I mean you acknowledge that, you know, I may have looked at this video and I might have let it in there.  But you acknowledge that just because I might have let it into evidence doesn't mean the trial court erred in excluding it.  Because you've got to have that ability and deference to a trial court in rendering these kinds of rulings.  You've got to be able to defer to the trial court especially when the standard of review is abuse of discretion.

P:      Well this is where…

J:      Just because *I* would've let it in doesn't the mean the trial court erred in excluding it.

P:      I absolutely concede that in the abstract.  That is a valid proposition.  And this where *Montgomery v. State* says that trials courts, if they have exceeded that zone of discretion, they don't get a free pass.  The Court of Appeals has to be able to review these rulings and make sure that the trial court watched the video.  In this case, the trial court didn't even watch the video.

J: She did get a pretty good review from *both* sides really about what it can take.

P: I respectfully disagree. And I really think the record it was a very brief mention of what it contained but she did not actually watch the video to weigh it's probative value and weigh whether there was any *unfair prejudice*. This is not just, "well the trial court might have had a reason in her head." She'd had to find unfair prejudice and actually do that balancing. That's what the Court of Criminal Appeals says. You have to be able to review that the trial court in fact did these things…

J: Of course, they don't have to do the balancing on the record.

P: They would need to reflect on the record that they had in fact made a 403 ruling.

To answer the question about what the ruling was, in Volume II of Reporter's Record at page 29, the court says, "here's what I'm going to do. You can keep it in your reserve bank for impeachment and that's it. So if he opens the door, then we'll take a look at it." And when we tried to offer it saying the door had been opened up…

J: That sounds like a very general open ended ruling to me.

P: Well even if the court wants to entertain 403, I would submit the best case for a road map…

J: I mean that's that's the best part of the record that you're quoting saying she's limited.

P: Yes.

J: That sounds pretty open ended.

P: And the court could entertain 403 and we welcome that. The best case for a road map for this is the *Samarkos v. Goddard* case from last year in California. And there the court reviews an impeachment ruling but also entertains 403 and finds the evidence could not have been kept out on 403 grounds.

R: Okay. Thank you very much.

P:      Thank you.