**Opinion issued April 29, 2014**



In The

# Court of Appeals

For The

# First District of Texas

―――――――――――――――

## NO. 01-12-00387-CV

―――――――――――――――

**SHARON HUSTON, Appellant**

**V.**

**UNITED PARCEL SERVICE, INC., Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-59257**

---

## O P I N I O N

Sharon Huston sued United Parcel Service, Inc. ("UPS") for negligence after one of UPS's drivers allegedly rear-ended her in an automobile collision. The trial court granted summary judgment in favor of Huston on liability, and the case

proceeded to trial solely on damages. The jury awarded Huston a total of $96,000 in damages, which the trial court reduced to $33,000 pursuant to Texas Rule of Civil Procedure 167. In three issues, Huston contends that (1) the trial court erroneously denied her the opportunity to effectively cross-examine a key defense witness; (2) the trial court erroneously limited the evidence of her past medical expenses to the amounts that a third-party company paid to several of Huston's medical providers for their accounts receivables; and (3) the jury's award of zero damages for past and future disfigurement, lost future earning capacity, future physical impairment, and future medical expenses was against the great weight and preponderance of the evidence.

We affirm.

## Background

On January 8, 2009, Huston stopped at a red light on the frontage road of I-45 South and Bellfort. Gabriel Haskin, a driver for UPS, stopped directly behind her in a package truck. According to Haskin, the traffic light turned green and he started to drive forward, but a driver to the left of him honked and distracted him. When he turned back and looked ahead of him, he noticed that Huston had not started driving forward into the intersection. Haskin slammed on his brakes but was unable to avoid hitting the rear of Huston's car. The trial court granted partial

2

summary judgment in favor of Huston on liability, and the parties proceeded to trial solely on the issue of damages.

At trial, the parties sharply disputed both the severity of the crash and the severity and extent of Huston's subsequent injuries. Huston testified that she started to move forward as soon as the light turned green, but, before she could accelerate, Haskin rear-ended her with such force that the collision "shot [her] like six lanes" across the road. She stated that her head "bashed" the steering wheel during the collision, and, as a result, she still had a mark on her forehead at the time of trial, nearly three years after the collision.[1] She also testified that, in the crash, she jammed her wrist, her knee hit the dashboard, her ankles "jammed into the gas pedal," and she had lower back pain. Huston stated that she still had pain in her back, hips, and neck, that she had trouble sitting for long periods of time, and that she was taking several medications each day. She testified that her understanding was that she might never fully recover from her injuries.

Huston consulted several doctors after the collision. Among her medical procedures after the collision were steroid injections, neck surgery, arthroscopic surgery on her knee, back surgery, and carpal tunnel surgery on her left hand. She testified that, in addition to the scar on her forehead, she has other scars from her surgery, including a visible one on her neck.

---

[1] On cross-examination, she testified that hitting her head on the steering wheel left a bruise but not a cut.

In contrast to Huston's testimony that the crash was severe, Haskin estimated that he was traveling approximately five miles per hour when his truck collided with Huston's car. Dr. John Laughlin, Huston's own biomedical engineering expert who performed accident reconstruction services, estimated that Haskin was traveling between seven and eleven miles per hour at the time of the collision. Haskin characterized the damage to Huston's vehicle as "minimal damage to where she can drive it," and he stated that his truck sustained no damage at all.

UPS retained Dr. Thomas Grieder, an orthopedic surgeon, to review Huston's medical records. Dr. Grieder testified via video deposition that the records from the Ben Taub General Hospital emergency room, where Huston went several hours after the collision, were consistent with Haskin's testimony that the collision occurred at a low speed. He noted that Huston presented inconsistent accounts of the collision to different doctors over the course of her medical care. He testified that, in addition to Huston's medical records following the collision at issue in this case, he also reviewed medical records from a car accident that Huston had in 2008, the year before the accident at issue in this case. He stated that x-rays of Huston's neck taken at that time revealed degenerative disc disease. He also testified that the medical records from the collision at issue revealed degenerative changes in Huston's knee, noticeable on x-rays the day after the collision. He

4

stated that degenerative changes could not occur because of trauma within that short a period of time.

Dr. Grieder testified that the medical records he reviewed revealed "no evidence that Ms. Huston sustained an identifiable injury to her right knee" as a result of the collision. He opined that Huston's problems leading to her knee surgery were not caused by the collision at issue and that she did not have an injury that necessitated the physical therapy that one of her doctors prescribed for her knee. He further testified that, several days after the collision, Huston's lumbar spine x-rays appeared normal and showed no injuries. He testified that Huston's cervical spine x-rays, taken two months after the collision, revealed degenerative disc disease, which could not be caused by an auto accident or whiplash. Dr. Grieder also testified that the neck and back surgeries that Huston underwent were not warranted because he was "not aware of any injury that she sustained in her neck or back that would—that would benefit from surgery." He stated, "My opinion is I have no evidence that [Huston] required any of that treatment to treat any injuries sustained in this accident." Dr. Grieder ultimately concluded that Huston sustained no permanent injury as a result of the collision, that she did not need further medical treatment, and that, in seeking treatment and recovery of damages, she was motivated by secondary gain, and not the primary goal of restoration of good health.

Huston also alleged that she suffered from traumatic brain injury as a result of the collision. UPS retained Dr. Francisco Perez, a neuropsychologist, to evaluate this claim. During his examination of her, Huston secretly recorded the encounter, and then played a portion of this recording at Dr. Perez's deposition in an attempt to challenge his recollection of how his session with her had ended. Huston subsequently moved to strike Dr. Perez's testimony on grounds of perjury. The trial court denied this motion.

The parties later submitted their page/line designations for the excerpts from Dr. Perez's video deposition that each party desired to publish to the jury at trial. At a pre-trial hearing, the trial court ruled on these designations. It is undisputed that, at this hearing, the trial court made a ruling limiting Huston's cross-examination of Dr. Perez. The parties strongly disagree, however, regarding the scope of that ruling and whether the ruling applied solely to the excerpts of Dr. Perez's deposition testimony or whether it would apply if Huston called Dr. Perez to testify live. Huston did not request a reporter's record of this pre-trial hearing and none was made. Therefore, the trial court's specific ruling on this question does not appear in the appellate record.

Huston also testified concerning her earning capacity. She stated that she had previously worked in auto sales and had been twice terminated by a dealership, but then she was told to report for work the next day and received a raise. She

testified that she could no longer physically perform this work due to the amount of walking involved with being a car salesperson. Shortly before the accident, Huston had entered into a contract to perform photography work for $4,000 per month. She agreed with UPS's counsel that she made approximately $8,000 in 2007 and $11,000 in 2008.

The trial court admitted a surveillance video that UPS obtained after the collision, reflecting that, despite her medical problems, Huston was able to move around normally. Dr. Jose Rodriguez, Huston's own orthopedic surgeon, testified that she should not still be using a walker to move around, as she had at trial, and that he expected that, by the end of the year, Huston could return to "sedentary" type work. Kenneth McCoin, Huston's economic expert, agreed on cross-examination that if Huston had had some medical event that was not related to the collision at issue and that event had caused her injuries affecting her ability to work, she would not have lost future wages because of the collision.

After the collision, Huston entered into an agreement with a company called A/R Net, which purchased the accounts receivable for some of Huston's medical providers at a discounted rate.[2] Under the contract between Huston and A/R Net, Huston remained liable to A/R Net for the full amount of the medical services billed by her medical providers, not the discounted rate at which A/R Net

---

[2] The record does not contain any of the accounts-receivable purchase agreements entered into between A/R Net and Huston's medical providers.

purchased the accounts. The receivables purchased by A/R Net totaled $240,849.44, for which it paid a total of $81,589.

Before trial, the parties disagreed over the amount of Huston's medical bills that should be submitted to the jury. Huston argued that she was entitled to present the gross total amount of her medical bills. UPS argued, in contrast, that, with respect to the bills of medical providers who had sold their accounts receivable to A/R Net, pursuant to Civil Practice and Remedies Code section 41.0105, Huston's recovery of damages and the evidence that she should be allowed to present to the jury on damages should be limited to the amount that A/R Net paid those providers for their receivables, and should not be the gross bill amounts.[3] The trial court agreed with UPS. The parties then stipulated, subject to Huston's objection, that the total amount Huston's medical providers had been paid or were entitled to be paid was $206,146.62.

The jury awarded Huston $15,000 for past pain and mental anguish, $15,000 for future pain and mental anguish, $15,000 for loss of earning capacity in the past, $1,000 for past physical impairment, and $50,000 for past medical expenses. The jury awarded Huston $0 for loss of earning capacity in the future, past and future

---

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.0105 (Vernon 2008) ("In addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant.").

disfigurement, physical impairment in the future, and future medical expenses. The jury thus awarded Huston a total of $96,000 in damages.

In its final judgment, the trial court noted that UPS had made a pre-trial offer to settle the case for $300,000. Because the amount ultimately awarded to Huston by the jury was less than eighty percent of the amount of the settlement offer, and thus the jury award was "significantly less favorable" to Huston than the offer, the trial court applied Texas Rule of Civil Procedure 167 and ruled that UPS was entitled to a set-off for its litigation costs. The trial court applied a $64,000 set off and rendered judgment that Huston recover $33,000 from UPS, plus post-judgment interest. This appeal followed.

### Limitation of Cross Examination

In her first issue, Huston contends that the trial court denied her an "effective opportunity to cross-examine a key witness," Dr. Perez, the neuropsychologist retained by UPS to evaluate Huston. UPS argues that Huston failed to preserve this complaint for appellate review because she failed to bring forth on appeal a record of the trial court's adverse ruling. We agree with UPS.

To preserve a complaint for appellate review, the record must show that the complaining party made a complaint to the trial court by timely request, objection, or motion and that the trial court ruled on the request, objection, or motion. *See* TEX. R. APP. P. 33.1(a). The appellant bears the burden to bring forward on appeal

9

a sufficient record to show the error committed by the trial court. *See Nicholson v. Fifth Third Bank*, 226 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex. 1990) (per curiam) ("The burden is on the appellant to see that a sufficient record is presented to show error requiring reversal."). The trial court has broad discretion regarding the extent of cross-examination allowed. *Harris Cnty. v. Inter Nos, Ltd.*, 199 S.W.3d 363, 368 (Tex. App.—Houston [1st Dist.] 2006, no pet.). The appellant's failure to obtain a reporter's record containing a challenged ruling makes it impossible for the appellate court to determine that the trial court abused its discretion in making the ruling. *See Brown Mech. Servs., Inc. v. Mountbatten Sur. Co., Inc.*, 377 S.W.3d 40, 44 n.1 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

An appellant may be entitled to a new trial due to a lost or destroyed portion of the reporter's record if (1) she timely requested a reporter's record; (2) without her fault, a significant portion of the court reporter's notes and records of the proceedings has been lost or destroyed; (3) the lost or destroyed portion of the record is necessary to the appeal's resolution; and (4) the lost or destroyed portion of the reporter's record cannot be replaced by agreement of the parties. *See* TEX. R. APP. P. 34.6(f); *Villagomez Invs., L.L.C. v. Magee*, 294 S.W.3d 687, 688 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

Dr. Perez testified at trial by video deposition. In her opening appellate brief, Huston argued that the trial court allowed her to play only the portion of Dr. Perez's deposition relating to his fees and improperly excluded the remainder of her cross-examination. In response, UPS agreed that the trial court made a ruling concerning Huston's cross-examination of Dr. Perez, but it disputed the scope of that ruling, arguing that the ruling was not as restrictive as Huston represented and did not prevent Huston from calling Dr. Perez as a witness and cross-examining him live before the jury. UPS also argued that Huston failed to preserve her complaint for appellate review, pointing out that no portion of the existing appellate record contained the ruling at issue. According to UPS, Huston thus failed to meet her burden to present a record of the challenged adverse ruling. In reply, Huston argued that she was entitled to a new trial under Rule 34.6(f) because the portion of the record containing the relevant ruling on Dr. Perez's cross-examination had been lost. She supplied the affidavits of her two trial attorneys as support that she had requested that the court reporter record the hearing at which the trial court made the relevant ruling.

Because of this dispute, we abated the appeal and directed the trial court to hold a hearing and make several findings of fact, including a finding on whether Huston had requested that the court reporter record the pretrial hearing at which the

11

trial court made its ruling concerning the cross-examination of Dr. Perez. The trial court held the requested hearing and made the following finding of fact:

> Despite Plaintiff's Counsel's testimony to the contrary, the evidence indicates that Huston **did not** request that the pretrial hearing at which the trial court made the ruling concerning cross-examination of Dr. Perez be transcribed by a court reporter. Furthermore, it is the Court's practice and procedure to allow any party a record upon request.

The court made a separate finding that "[t]he hearing was not recorded and Huston did not timely request the reporter's record of that hearing." We conclude that because Huston did not timely request a reporter's record of the pretrial hearing at issue, and no such record was ever made, she is not entitled to a new trial pursuant to Rule 34.6(f). *See* TEX. R. APP. P. 34.6(f) (requiring, as condition for being entitled to new trial due to lost or destroyed record, that appellant has timely requested reporter's record); *Villagomez Invs.*, 294 S.W.3d at 688.

We further conclude that because Huston has not presented a record containing the trial court's ruling on the cross-examination of Dr. Perez, which she challenges on appeal, she has not met her burden to bring forward a sufficient record demonstrating error by the trial court. *See Christiansen*, 782 S.W.2d at 843; *Nicholson*, 226 S.W.3d at 583; *see also Brown Mech. Servs.*, 377 S.W.3d at 44 n.1 (holding that failure to obtain reporter's record makes it impossible for appellate court to determine whether trial court abused its discretion); *Inter Nos Ltd.*, 199 S.W.3d at 368 (holding that trial court has "broad discretion" in determining extent

of cross-examination). We hold that Huston has failed to preserve this complaint for appellate review.

We overrule Huston's first issue.

## Evidence of Medical Expenses

In her second issue, Huston contends that she incurred the full amount of expenses billed by her medical providers because A/R Net, which purchased certain accounts receivable, is legally entitled to recover the full amount of the charges billed, and Huston is contractually obligated to pay the full amount to A/R Net. She contends, therefore, that the trial court erroneously limited the evidence of her past medical expenses to the discounted amount that A/R Net paid to the providers to purchase the accounts receivable.

Civil Practice and Remedies Code section 41.0105 provides, "In addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.0105 (Vernon 2008). The Texas Supreme Court construed this provision in *Haygood v. De Escabedo* and held that "this statute limits recovery, and consequently the evidence at trial, to expenses that the [medical] provider has a legal right to be paid." 356 S.W.3d 390, 391 (Tex. 2011). In *Haygood*, twelve different health care providers billed Haygood, who was covered by Medicare Part B, a total of $110,069.12. *Id.* at 392.

13

Pursuant to federal regulations that prohibited providers from charging patients more than Medicare had determined to be reasonable, Haygood's providers applied $82,329.69 in adjustments, leaving a total of $27,739.43 to be paid. *Id.* At trial, the trial court allowed Haygood to introduce evidence of the full, gross amounts billed by his providers, and the jury awarded the full amounts billed as past medical expenses. *Id.* The Tyler Court of Appeals reversed, holding that "section 41.0105 precluded evidence or recovery of expenses that 'neither the claimant nor anyone acting on his behalf will ultimately be liable for paying.'" *Id.*

In affirming the court of appeals, the Texas Supreme Court first discussed the general rationale behind the recovery of compensatory damages, which are "intended to make the plaintiff 'whole' from any losses resulting from the defendant's interference with the plaintiff's rights," and the collateral source rule, which "precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else." *Id.* at 394 (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994)). The supreme court disagreed with Haygood that an adjustment to medical bills required by an insurer is not a collateral benefit, holding instead that "[a]n adjustment in the amount of those charges to arrive at the amount owed is a benefit to the insurer, one it obtains from the provider for itself, not for the insured." *Id.* at 395. The court acknowledged the collateral source rule, which operates to prevent windfalls to tortfeasors, but

14

also noted that "impos[ing] liability for medical expenses that a health care provider is not entitled to charge does not prevent a windfall to a tortfeasor; it creates one for a claimant." *Id.* The court therefore concluded that the collateral-source rule "does not allow recovery as damages of medical expenses a health care provider is not entitled to charge." *Id.* at 396.

The supreme court then turned to the text of section 41.0105 and reasoned that "actually paid and incurred," as used in the statute, "means expenses that have been or will be paid, and excludes the difference between such amount and charges the service provider bills but has no right to be paid." *Id.* at 396–97. It reiterated that a tortfeasor is not liable to a health care provider or to the claimant for medical expenses that the claimant was not required to pay to the provider because to hold otherwise would allow the claimant to recover a windfall. *Id.* at 397. The court therefore concluded that section 41.0105 "limits a claimant's recovery of medical expenses to those which have been or must be paid by or for the claimant." *Id.* at 398. The court then held that because a claimant is not allowed to recover medical expenses that the provider is not entitled to be paid, "evidence of such charges is irrelevant to the issue of damages" and is inadmissible. *Id.* The court ultimately concluded that "only evidence of recoverable medical expenses is admissible at trial" and that the court of appeals correctly held that the trial court erred in

allowing Haygood to present evidence of the full amount of medical expenses billed to him. *Id.* at 399–400.

Huston argues that section 41.0105 and the Texas Supreme Court's decision in *Haygood* have no effect on her recovery because, although A/R Net purchased select accounts receivables at a discounted rate, she is contractually obligated to pay A/R Net the full amount of the expenses that the medical providers billed her, and A/R Net is entitled to recover the full amount of those expenses. Thus, under these circumstances, restricting Huston's recovery and the evidence of medical bills presented at trial to the amount that A/R Net paid to the providers does not create a windfall in her favor but instead leaves her "grossly undercompensated because she is still liable to A/R Net for the entire amount." UPS argues, in contrast, that *Haygood* clearly limits a plaintiff's recovery to the amount that the *medical providers* have a right to be paid, which, here, is the amount for which A/R Net purchased the accounts receivable from the providers. As such, according to UPS, the trial court correctly excluded evidence of medical expenses other than what the medical providers had the right to be paid.

Assuming, without deciding, that the trial court erroneously limited the evidence of Huston's past medical expenses to the amounts that the medical providers had the right to be paid instead of allowing evidence of the full amount of medical expenses billed to Huston, we agree with UPS that, in this case, such an

error is harmless. To obtain reversal on this issue, Huston had to establish that the trial court's error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a). After the trial court's ruling limiting the amount of past medical expenses that Huston could present to the jury pursuant to section 41.0105 and *Haygood*, the parties stipulated, over Huston's objection, that she had incurred $206,146.62 in past medical expenses. The jury ultimately awarded Huston only $50,000 in damages for past medical expenses, less than twenty-five percent of the amount for which she had presented evidence. Huston has not demonstrated that, had she been allowed to present the full amount of the medical expenses for which she was billed, the jury would have awarded her that amount or any amount greater than the $50,000 that it did award.

We therefore conclude that Huston has not established that the trial court committed reversible error when it limited the evidence of past medical expenses to the amount that the medical providers, as opposed to A/R Net, had a legal right to collect.

We overrule Huston's second issue.

### Sufficiency of Evidence of Damages Award

In her third issue, Huston contends that the jury's award of zero damages for past and future disfigurement, loss of future earning capacity, future physical

17

impairment, and future medical expenses was against the great weight and preponderance of the evidence.

In reviewing a challenge to the factual sufficiency of the evidence, we "must consider and weigh all of the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)); *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (holding same). The fact-finder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Arias*, 265 S.W.3d at 468; *see also Lanier v. E. Founds., Inc.*, 401 S.W.3d 445, 455 (Tex. App.—Dallas 2013, no pet.) ("When we review the evidence, we may not reweigh it and set aside the verdict merely because we feel a different result is more reasonable."). Because it is the fact-finder's province to resolve conflicts in the evidence, we assume that it resolved all such conflicts in favor of the verdict if reasonable people could do so. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468.

Generally, the jury has great discretion in considering evidence relevant to the issue of damages. *See Lanier*, 401 S.W.3d at 455 (citing *McGalliard v.*

18

*Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)).  Issues such as physical impairment are necessarily speculative, "and it is particularly within the jury's province to resolve these matters and determine the amounts attributable thereto."  *Id.*; *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The amount of damages awarded for pain and suffering and disfigurement are necessarily speculative and each case must be judged on its own facts."). Courts have defined disfigurement as "that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner."  *Figueroa*, 318 S.W.3d at 64 (quoting *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)).  Future disfigurement is "necessarily speculative" and "there is no mathematical yardstick by which one can measure damages for it."  *Id.* (quoting *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 494 (Tex. App.—Houston [14th Dist.] 1989, no writ)).

Lost earning capacity is an assessment of the plaintiff's capacity to earn a livelihood prior to injury and the extent to which the injury impaired that capacity. *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158–59 (Tex. App.—Amarillo 2012, pet. denied).  This measure of damages is not measured by what a person actually earned before the injury but by the person's capacity to earn, even if she had never worked in that capacity in the past.  *Id.*; *Gen. Motors*

*Corp. v. Burry*, 203 S.W.3d 514, 553 (Tex. App.—Fort Worth 2006, pet. denied). Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after trial. *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied). Proof of lost earning capacity is always uncertain and is left largely to the jury's discretion. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied). To support an award for damages for lost earning capacity, the plaintiff must present evidence sufficient to permit a jury to reasonably measure earning capacity in monetary terms. *Tagle v. Galvan*, 155 S.W.3d 510, 519–20 (Tex. App.—San Antonio 2004, no pet.). Non-exclusive factors to consider include evidence of past earnings and the plaintiff's stamina, efficiency, ability to work with pain, and work-life expectancy. *Big Bird Tree Servs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied). There must be some evidence that the plaintiff had the capacity to work prior to the injury and that that capacity was impaired as a result of the injury. *Reynolds*, 127 S.W.3d at 36.

"When there is conflicting evidence about the severity of the injuries or about whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages." *Lanier*, 401 S.W.3d at 455. The jury may determine that only part of the injuries were caused by the defendant's conduct at issue and

20

may award damages accordingly. *Id.* Courts have upheld jury awards of zero damages even when subjective and objective evidence of injuries existed so long as the verdict was not so against the great weight of the evidence as to be manifestly unjust. *See id.* at 456.

Huston contends that the jury's award of zero damages for past disfigurement is against the great weight and preponderance of the evidence because she presented evidence that she hit her head on the steering wheel of her car in the collision, that she had a "prominent scar" on her forehead that was still visible at the time of trial, and that she had scars on her throat, knee, and back from the multiple surgeries that she had had following the collision.

UPS, however, presented evidence that the injuries for which Huston requested damages were not actually caused by the collision. Huston testified that she hit her head on her steering wheel, which caused a bruise, but she admitted on cross-examination that she did not cut her forehead. Gabriel Haskin testified that he was going approximately five miles an hour when he rear-ended Huston, and thus the collision occurred at a low speed. Huston's own biomechanical engineering expert concluded that Haskin's truck was traveling between seven and eleven miles per hour at the time of the collision. Dr. Grieder, an orthopedic surgeon, testified that he reviewed Huston's medical records, and he stated that

Huston's initial emergency-room complaints of a headache and neck pain were consistent with a low-speed collision.

Dr. Grieder also noted that Huston saw numerous doctors after the collision and that she presented inconsistent accounts of what had happened in the accident and her initial symptoms. He also noted that Huston had been in a car accident approximately one year before the accident at issue and that x-rays taken after that incident and before the incident that forms the basis of this case indicated that Huston had degenerative disc disease in her neck. Dr. Grieder further testified that diagnostic tests conducted after the collision at issue in this case revealed that Huston had degeneration in her knee, which could not have been caused by the collision. He stated that he saw "no evidence" that Huston "sustained an identifiable injury to her right knee" in the collision. Dr. Grieder concluded that the condition leading to Huston's knee surgery was not caused by the collision. He also noted that a lumbar-spine x-ray taken three or four days after the collision was normal and showed no injuries.[4] He stated, "So, we have a lady here that's

---

[4]     On cross-examination of Dr. Rodriguez, Huston's treating orthopedic surgeon, the following exchange occurred:

> [UPS's counsel]:     So you would have to change your opinion that you gave earlier that the low back was caused because of the accident with UPS. You can't say that now that you've seen all the records, true?
>
> [Dr. Rodriguez]:     That's correct.

complaining of painful things; but we have no other objective data to confirm what she is telling us is true." He further stated, "I'm not aware of any injury that she sustained in her neck or back that would—that would benefit from surgery."

Huston undisputedly had surgery that resulted in several surgical scars. However, UPS presented evidence disputing Huston's contention that UPS's conduct caused those injuries. It is within the jury's province as the fact finder to consider the credibility of the witnesses and weigh the evidence. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468. The jury also has discretion to determine that only part of the injuries at issue were caused by the defendant's conduct, and it may award damages accordingly. *See Lanier*, 401 S.W.3d at 455. In this situation, in which conflicting evidence exists concerning the severity of Huston's injuries and the cause of those injuries, the jury has the discretion to resolve the conflicts in the evidence, to choose which version of the evidence to accept, and to refuse to award damages. *See id.* Here, the jury resolved the conflicts in the evidence in favor of UPS, and we conclude that the jury's failure to award damages for past and future disfigurement was not against the great weight and preponderance of the evidence.

In challenging the jury's award of zero damages for loss of future earning capacity, Huston argues that "[i]t is abundantly clear that [she] has lost earnings in the past and in the future" and notes that "she had just started a job with a contract

for $4,000 per month that she was only able to perform for one week before the collision." She presents no further argument for why the jury's award of no damages was against the great weight and preponderance of the evidence, and she does not address the factors that courts consider when reviewing an award of damages for loss of future earning capacity, such as her stamina, efficiency, ability to work through pain, and work-life expectancy. *See Big Bird Tree Servs.*, 365 S.W.3d at 178; *see also* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Although Huston presented evidence that she was unable to return to the photography job that she had just started at the time of the collision, and economic evidence suggesting that she could expect diminished future earnings as a result of the collision, UPS presented evidence in the form of a surveillance video that indicated Huston was able to move around normally. Dr. Rodriguez, Huston's own orthopedic surgeon, testified that Huston should not use a walker to move around and that he would expect that, by the end of the year, Huston could return to a "sedentary type" of work. Kenneth McCoin, Huston's economic expert, agreed on cross-examination that, if Huston had "some medical event in her life that is not in anyway tethered to this car wreck and . . . is not influenced by this car wreck," then she would have no lost future wages because of the collision.

We conclude that the jury resolved the conflicting evidence in favor of UPS and that the jury's award of zero damages for loss of future earning capacity was not against the great weight and preponderance of the evidence. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468.

Huston further challenges the jury's award of zero damages with respect to physical impairment in the future and future medical expenses. On appeal, Huston presents no argument in support of this challenge beyond stating, "With respect to the jury's awards of no damages for . . . physical impairment in the future, and medical expenses in the future, clearly there was more than sufficient evidence to demonstrate such losses." Huston has not identified any testimony relevant to medical expenses that she expects to incur in the future. We conclude that Huston has waived these challenges for failure to adequately brief these contentions. *See* TEX. R. APP. P. 38.1(i).

When we consider all the evidence, we conclude that the jury's award of zero damages for past and future disfigurement, loss of future earning capacity, physical impairment in the future, and future medical expenses is not so against the great weight and preponderance of the evidence that the verdict is manifestly unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Arias*, 265 S.W.3d at 468.

We overrule Huston's third issue.

**Conclusion**

We affirm the judgment of the trial court.


                                             Evelyn V. Keyes
                                             Justice

Panel consists of Justices Keyes, Bland, Brown.