**Opinion issued November 1, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00612-CV

————————————

**DIANE DAVIS, Appellant**

**V.**

**BRANDAN VAUGHTERS, Appellee**

On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2015-35972

## MEMORANDUM OPINION

Appellant, Diane Davis, challenges the trial court's judgment, entered after a jury trial, in her negligence suit against appellee, Brandan Vaughters, for damages arising from an auto collision. In her first issue, Davis contends that the jury's

answers conflict, in that they award her damages for past medical expenses, but award her zero damages for future medical expenses and for past and future pain and suffering, mental anguish, and impairment. In her second issue, she challenges the factual sufficiency of the evidence supporting the jury's negative answers.[1]

We affirm.

## Background

On December 31, 2013, while Davis was traveling east on West 20th Street in Houston, Vaughters was traveling south on Durham Street. At the intersection of West 20th Street and Durham, Vaughters did not stop at a red signal light governing traffic in his direction, entered into the intersection, and collided with Davis's car, striking the driver's side door. Davis sued Vaughters for negligence, alleging that he had failed to apply his brakes, to control his speed, to stop at the traffic light, and to avoid the collision. Davis sought damages, as pertinent here, for past and future: medical expenses, "physical and mental pain and anguish," and physical impairment.

At trial, Vaughters stipulated to his liability for the collision. He testified that he was looking at his GPS at the time that he entered the intersection, did not see the

---

[1]    A complaint that the amount of damages awarded is "against the great weight and preponderance of the evidence" is a complaint about factual sufficiency. *Griffin v. Carson*, No. 01-08-00340-CV, 2009 WL 1493467, at *2 (Tex. App.—Houston [1st Dist.] May 28, 2009, pet. denied) (mem. op.).

red light, "ran through the red light," and collided with Davis's car. Vaughters further testified that he was willing to accept responsibility for Davis's damages, "[a]s long as [they] pertain[ed] to the accident."

Davis testified regarding, and the trial court admitted into evidence, photographs of the damage to each car and the police officer's crash report from the scene. The photographs depicting the damage to Davis's car showed her driver's side door and window intact, but with a dent and scrape at the base of the door. The crash report showed that the responding police officer rated the "damage severity" of the collision a "1," out of a possible "0" to "7," and noted that Davis and her passenger were "not injured." The officer also noted that no citation was issued because there was "minimal damage." After the collision, Davis and her passenger drove home in Davis's car. Davis testified that the cost to repair her car was "between four and $5,000."

On January 2, 2014, Davis sought treatment at Eastex Medical Clinic for headaches and pain in her chest, back, elbow, and ankle, which she attributed to the collision, and she underwent physical therapy.

On January 23, 2014, Davis underwent magnetic resonance imaging (an "MRI") of her neck at North Houston Imaging Center. Davis's medical records, which the trial court admitted into evidence, showed that her cervical spine had "no acute compression fracture"; had a "[s]lightly decreased signal intensity of the

3

discs"; had "no disc bulge or protrusion" at C2 through C5; had a "2 mm disc protrusion" at C5-C6; and had a "small posterior osteophyte" at C6-C7.

On February 10, 2014, Davis visited her primary care physician, Dr. Orlando Fonseca, for clearance to undergo a previously scheduled breast augmentation and "tummy tuck" surgery. Dr. Fonseca's examination notes, which the trial court admitted into evidence, include that Davis's neck was "supple" and that her back was "normal, no tenderness." He noted that Davis denied having any headaches, joint or muscle pain, or swelling. And, Davis was "cleared to undergo surgery." The records of The Aesthetic Center for Plastic Surgery, which the trial court admitted into evidence, reflect that, on February 14, 2014, Davis underwent abdominoplasty and mastopexy, in addition to a liposuction procedure on her thighs, knees, hips, back, and arms.

On March 4, 2014, Davis visited Dr. Kenneth Berliner for an orthopedic consultation. Dr. Berliner's examination notes, which the trial court admitted into evidence, include that Davis had "tenderness" in her neck with "painful decreased cervical range of motion." Dr. Berliner noted that, from his review of the January 23, 2014 MRI, Davis had a "2-mm protrusion at C5-C6." Dr. Berliner recommended, based on Davis's report of "persistent cervical pain" and "finger tingling," that she undergo a series of cervical epidural steroid injections and

4

physical therapy. Dr. Berliner's March 18, 2014 "Final Evaluation" states that Davis could "[p]roceed doing all activities with caution."

On April 15, 2014, Davis returned to Dr. Fonseca's office for a "follow up on chronic conditions," namely, osteoporosis and anemia. Dr. Fonseca's notes include that Davis's neck was "supple" and that she reported feeling "numbness" and "tingling" in her arms, back, and thighs "after her surgery."

On August 27, 2014, Davis returned to Dr. Fonseca for an annual routine physical. Dr. Fonseca's notes again include that Davis's neck was "supple" and that her back was "normal, no tenderness." He further noted that Davis "denie[d] joint pain, swelling, muscle pain" and "ha[d] been exercising and watching her diet closely and ha[d] lost 32 Lbs within 6 months."

On September 24, 2014, Davis underwent a cervical epidural steroid injection in her neck, at C5-C6. The records of Advanced Diagnostics Healthcare, Texas Institute for Spine Care, which the trial court admitted into evidence, reflect that Davis "ha[d] not responded to conservative management strategies and was recommended for cervical epidural steroid injection." And, "[a]n MRI of the cervical spine dated 1/23/14 indicate[d] a disc herniation at C5-6."

Davis testified that, thereafter, despite Dr. Berliner having recommended that she have a series of injections, she had no further injections or treatments for injuries from the collision. She further noted that she did not plan on having any future

5

collision-related treatments, injections, or surgeries and that she was not under any doctor's restrictions.

Davis testified generally that, since the collision, her physical activity had "slowed down quite a bit." She explained that, a few months prior to the collision, she had participated in a "gladiator run" in Dallas, which she described as follows:

> [W]e had to run the stadium, go down the stairs to the ground floor. And it was an obstacle—we had to crawl under, jump over, climb over. I had to pull myself up with a rope over a wall and do tires, run through the tires and had some sandbags that you have to lift and take to a certain point and climb a—it was—it's like a roped wall, had to climb that to a—to the very top of a slide and slide down, and just a variation of a—of a course.

Since the collision, however, she has no longer been able to participate in such activities or walk for long periods of time, which she described as longer than 10 to 15 minutes, because her lower back and ankles "start bothering her." She is "uncomfortable" "some days" and takes ibuprofen "every now and then" for pain. Also, she can no longer participate in dancing or sports with her family.

Davis's daughter, Diane Macias, testified that she has a close relationship with Davis and works with her daily at the family's automotive shop. Macias testified that, prior to the collision, Davis was "very active." Macias and Davis regularly ran together at a local park and participated in "5K runs a lot." Three to four times per week, Macias and Davis participated in Camp Gladiator boot camp, which included activities such as running up hills, "burpees," "bear crawls," and working out with

6

weights. Macias noted that, prior to the collision, Davis did not complain about physical pain. Since the collision, however, Davis can no longer lift weights "like she used to" or run or participate in races because it hurts her back. Davis has not been able to exercise "at all" or participate in playing soccer or basketball with Macias's children; is not able to participate in salsa dancing as in the past; and can no longer take family vacations that involve driving for long periods of time because she feels pain in her back. Macias noted that, at work, Davis is unable to perform her usual filing tasks or carry anything to her car. Her back and neck bother her, and she gets "really bad headaches."

Jennifer Hummel, also Davis's daughter, testified that she has a close relationship with her mother and works with her daily at the family business. Hummel testified that, prior the collision, Davis worked out, was "very much into her Camp Gladiator" boot camps, and participated in the Camp Gladiator Games in Dallas. Hummel explained that such boot camps and competitions involved obstacle courses, including climbing walls. Davis also loved salsa dancing and went dancing "very often." Davis regularly played with Hummel's children at the park across the street from Davis's house. Since the collision, however, Davis no longer goes dancing or participates at the gym, no longer drives the family on long vacations, and has anxiety when she rides in cars. Davis "can't sit down for too long" because her back "starts bothering her," and she has a "little bit of neck pain" and "can't do

7

a whole lot of bending or lifting." The trial court admitted into evidence a Facebook photograph, dated February 20, 2016, depicting Davis carrying her grandchild on her back at a benefit walk. Hummel explained that her husband had placed the child on Davis's back only long enough to take the photograph.

Dr. Berliner testified that, based on his examination of Davis and review of her records, he found "nothing remarkable" in the MRI from C2 through C5; a "herniated disc" between C5 and C6; and "some small spurs" at C6-C7. He opined that it was "more likely than not" that the collision "probably caused the herniation or protrusion at C5-6; but if it wasn't actually caused, then it worsened any . . . asymptomatic preexisting herniation that [Davis] may have had." He noted that Davis was 55 years of age at the time of the collision and that "[a]ny one of those findings" on the MRI could be associated with aging. He also noted that, during his examination, Davis showed "some cervical tenderness" and "pain with range of motion, with movement of the neck." He recommended a series of epidural steroid injections and physical therapy for her cervical pain and "finger tingling."

Dr. Berliner further testified that he reviewed Davis's billing records, which the trial court admitted into evidence, and that the fee of $2,600 billed by North Houston Imaging Center for Davis's MRI, and the fee of $7,025 billed by Advanced Diagnostics Healthcare for Davis's September 24, 2014 cervical epidural steroid injection, were reasonable and customary in Harris County. Dr. Berliner opined that,

8

although Davis had not had any medical treatment for her collision-related complaints since 2014, it was "more likely than not [that] she [would] return to the doctor within—sometime within 30 years." And, were she to return to him, he would recommend three additional injections, which, along with associated physical therapy, would cost a total of $20,400.

Dr. Nilesh Kotecha, a neurosurgeon, testifying as an expert for Davis, stated that he examined her on August 25, 2014, when she presented with complaints of pain in her neck, lower back, and an arm, which she attributed to the collision. Davis described her pain, which she noted was aggravated while standing or sitting, as being, "on an average," at "five out of ten, ten being the worst." At times, her pain was a "nine out of ten."

Dr. Kotecha testified that, with respect to Davis's neck, his examination of her and his review of the January 23, 2014 MRI revealed that, aside from normal age-related changes, she had a 2-millimeter protrusion in the disc at C5-C6 and a "posterior osteophyte" at C6-7. He explained that a "disc" is a cushion that separates bones and allows flexibility of the neck. When a disc slips out of place, it is called a "protruding or herniated disc." He further explained that osteophytes develop as a result of wear and tear and that herniations and osteophytes appear as a normal part of the aging process, as follows:

> So, for example, if you take 100 people age 56 without any symptoms whatsoever, none whatsoever, and you ran them through an MRI

machine, I'd say at least a third or maybe more of those patients are going to have abnormal-looking MRI scans. So they're going to have these little spurs, disc herniations, et cetera, that are going to be seen.

Dr. Kotecha opined that, based on a reasonable medical probability, the collision on December 31, 2013 "may not necessarily have caused" Davis's herniated disc, but "could have certainly caused an aggravation of a preexisting condition" and caused her to become symptomatic. Dr. Kotecha noted that "[i]t would not surprise" him if Davis, who was in her mid-fifties, had the herniated disc prior to the collision. He noted that the majority of such herniated discs "actually heal themselves."

At the close of trial, a single question was submitted to the jury, allowing it to award Davis damages in six categories:

> What sum of money, if now paid in cash, would fairly and reasonably compensate [Davis] for her injuries, if any, that resulted from the occurrence in question?
>
> Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find. Do not include any amount for any condition existing before the occurrence in question except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question.

As to past medical care expenses, the jury answered: $6,163.00. The jury answered "$0" as to "[p]hysical pain and mental anguish in the past"; "[p]hysical pain and mental anguish" in the future; physical impairment in the past; physical

10

impairment in the future; and, medical care expenses in the future.  Neither party objected to the verdict, and the jury was discharged.  The trial court then entered a judgment on the verdict, awarding Davis $6,163.00 in damages against Vaughters.

Davis filed a motion for new trial, asserting that the damages awarded were against the great weight and preponderance of the evidence.   The trial court denied the motion for new trial.

## Conflict in the Jury's Answers

In her first issue, Davis asserts that the jury's answers conflict, in that they award her damages for past medical expenses, but award her zero damages for future medical expenses and for past and future pain and suffering, mental anguish, and impairment.  She asserts that such conflict is "fatal" and necessitates a new trial. *See* TEX. R. CIV. P. 295.

> Texas Rule of Civil Procedure 295 provides:
>
> If the purported verdict is defective, the court may direct it to be reformed. If it is incomplete, or not responsive to the questions contained in the court's charge, or the answers to the questions are in conflict, the court shall in writing instruct the jury in open court of the nature of the incompleteness, unresponsiveness, or conflict, provide the jury such additional instructions as may be proper, and retire the jury for further deliberations.

*Id.*; *see USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 509 (Tex. 2018) (concluding that jury answer requiring judgment in favor of plaintiff and another requiring judgment in favor of defendant presented "an irreconcilable conflict").

11

Even were we to conclude that Davis has identified a conflict in the jury's answers, which we do not, it is well-established that "to preserve error based on fatally conflicting jury answers, parties must raise that objection before the trial court discharges the jury." *See USAA Texas Lloyds Co.*, 545 S.W.3d at 518. When the alleged error is an incomplete, nonresponsive, or conflicting jury verdict, rule 295 requires the trial court to correct the error by providing additional instructions and retiring the jury "for further deliberations." *Id.* (quoting TEX. R. CIV. P. 295). Once the trial court has discharged the jury, it cannot reform the conflicting answers as rule 295 requires. *Id.* If the trial court does not identify a conflict and no party raises it before the court discharges the jury, "the conflict provides no basis for reversal on appeal, even if it is 'fatal.'" *Id.* at 520.

We conclude that, because Davis did not raise any objections to the jury's answers before the jury was discharged, error, if any, is not preserved. *See id.*

## Factual Sufficiency

In her second issue, Davis argues that the evidence is factually insufficient to support the jury's answer of zero damages for past and future physical pain and suffering, mental anguish, and impairment because "the facts are undisputed that [she] suffered physical pain and mental anguish and impairment as a result of her

injuries."[2] She asserts that the evidence establishes "as a matter of law" her objective symptoms of injury, pain, and impairment.

When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We consider and weigh all of the evidence and set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)); *Doctor v. Pardue*, 186 S.W.3d 4, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

When, as here, an appellant challenges a jury's failure to find damages in more than one overlapping category, we first determine whether the evidence unique to each category is factually sufficient.[3] *See Golden Eagle Archery, Inc. v. Jackson*,

---

[2]    Although Davis also complains about the jury's zero damages finding with respect to her future medical expenses, she does not provide any argument in her brief in support. We conclude that Davis has waived this challenge for failure to adequately brief her contention. *See* TEX. R. APP. P. 38.1(i); *Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 643 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

[3]    Certain categories of non-economic damages may somewhat overlap. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 770–71, 773–74 (Tex. 2003); *Doctor v. Pardue*, 186 S.W.3d 4, 18 n.14 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "Non-economic damages include compensation for pain, suffering, mental anguish, and disfigurement," and may also include compensation for loss of enjoyment of life. *Golden Eagle Archery*, 116 S.W.3d at 763.

116 S.W.3d 757, 775 (Tex. 2003). If it is not, we then consider all of the overlapping evidence, together with the evidence unique to each category, to determine whether the total amount awarded in the overlapping categories is factually sufficient. *Id.*

A jury generally has great discretion in considering evidence on the issue of damages. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony and may choose to believe one witness over another and resolve any inconsistencies. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Zenner v. Lone Star Striping & Paving L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Matters of pain and suffering, mental anguish, and physical impairment are necessarily speculative, and it is particularly within the jury's province to resolve these matters and to determine any amounts attributable thereto. *Belford v. Walsh*, No. 14-09-00825-CV, 2011 WL 3447482, at *7 (Tex. App.—Houston [14th Dist.] Aug. 9, 2011, no pet.) (mem. op.); *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The process of awarding damages for amorphous, discretionary injuries such as . . . pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." (internal quotations omitted)).

14

*Past and Future Pain and Suffering*

The presence or absence of pain is an inherently subjective question for which the plaintiff bears the burden of production and persuasion. *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 397–98 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "Some objective injuries are so significant that an award of damages for physical pain is mandated." *Id.* at 397. Examples of serious, objective injuries that will support an award of damages for subjective complaints of pain include bone fractures, severe burns, and lacerations. *Id.* at 398 (citing, *e.g.*, *Hammett v. Zimmerman*, 804 S.W.2d 663, 668–69 (Tex. App.—Fort Worth 1991, no writ) (reversing zero damage finding for pain and suffering associated with listing of lumbar spine and declination of sacral base plane)).

However, evidence of pain that is conflicting, scant, or more subjective favors upholding a jury's finding of no damages. *See Hammett*, 804 S.W.2d at 668–69 (upholding zero damage finding for pain and suffering associated with restricted range of motion, tightness, and tenderness); *see also In re State Farm Mutual Automobile Ins. Co.*, 483 S.W.3d 249, 263 (Tex. App.—Fort Worth 2016, no pet.). Even when there is uncontroverted evidence of an injury, a jury "may properly deny an award of any damages when the injuries sustained are subjective, such as back and neck soft-tissue injuries." *Gutierrez v. Martinez*, No. 01-07-00363-CV, 2008 WL 5392023, at *6 (Tex. App.—Houston [1st Dist.] Dec. 19, 2008, no pet.) (mem.

15

op.). "When there is conflicting evidence about the severity of the injuries or about whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages." *Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (internal quotations omitted).

Further, "a damage award for physical pain is not always mandated" just because medical expenses are awarded. *Enright*, 330 S.W.3d at 398. Even if an injury is undisputed, when it is less serious and accompanied only by subjective complaints of pain, a jury may reasonably believe that the injured party should be compensated "for seeking enough medical care to ensure that [the] injury was not serious," yet also conclude that the injured party "never suffered pain warranting a money award." *Id.* at 397–98 (quoting *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 805 (Tex. App.—Dallas 1988, no writ)); *see also McGuffin v. Terrell*, 732 S.W.2d 425, 428 (Tex. App.—Fort Worth 1987, no writ) (holding that "evidently the jury found appellant's injury so minimal as to not warrant an award for past pain and suffering," despite jury's award of medical expenses for treatment of muscle spasms).

Here, the jury heard testimony that, prior to the collision, Davis was "very much into her Camp Gladiator" boot camps, which included running up hills, "burpees," "bear crawls," and working out with weights, in which she participated

16

three or four times per week, and that Davis had, just a few months prior to the collision, participated in the Camp Gladiator Games, which Davis described as follows:

> [W]e had to run the stadium, go down the stairs to the ground floor. And it was an obstacle—we had to crawl under, jump over, climb over. I had to pull myself up with a rope over a wall and do tires, run through the tires and had some sandbags that you have to lift and take to a certain point and climb a—it was—it's like a roped wall, had to climb that to a—to the very top of a slide and slide down, and just a variation of a—of a course.

The jury also heard evidence that the police officer at the scene of the collision rated the "damage severity" of the collision a "1," out of a possible "0" to "7," noted that no citation was issued because there was "minimal damage," and noted that Davis and her passenger were "not injured." After the collision, Davis and her passenger drove home in Davis's car. Davis testified that the cost to repair her car was "between four and $5,000." The photographs in evidence show a dent and scrape at the base of Davis's driver's side door, with the door and window intact.

The evidence further shows that, days after the collision, Davis sought treatment for headaches and pain in her chest, back, elbow, and ankle, which she attributed to the collision. Her January 23, 2014 MRI showed that her cervical spine had "no acute compression fracture"; had a "[s]lightly decreased signal intensity of the discs"; had "no disc bulge or protrusion" at C2 through C5; had a "2 mm disc protrusion" at C5-C6; and had a "small posterior osteophyte" at C6-C7. Dr. Berliner

17

testified that that there was "nothing remarkable" in the MRI from C2 through C5; a "herniated disc" between C5 and C6; and "some small spurs" at C6-C7. He opined that it was "more likely than not" that the collision "*probably* caused the herniation or protrusion at C5-6; *but if it wasn't* actually caused, then it worsened . . . any asymptomatic preexisting herniation that [Davis] may have had." (Emphasis added.) He noted, however, that Davis was 55 years old at the time of the collision and that "[a]ny one of those findings" on the MRI could be associated with aging.

Dr. Kotecha, testifying as Davis's expert, opined that, based on a reasonable medical probability, the collision on December 31, 2013 "*may not necessarily* have caused" Davis's herniated disc, but "*could have* certainly caused an aggravation of a preexisting condition" and caused her to become symptomatic. (Emphasis added.) Dr. Kotecha testified that herniations and osteophytes appear as a normal part of the aging process, as follows:

> So, for example, if you take 100 people age 56 without any symptoms whatsoever, none whatsoever, and you ran them through an MRI machine, I'd say at least a third or maybe more of those patients are going to have abnormal-looking MRI scans. So they're going to have these little spurs, disc herniations, et cetera, that are going to be seen.

Dr. Kotecha noted that "[i]t would not surprise" him if Davis, who was in her mid-fifties, had the herniated disc prior to the collision. And, he noted that the majority of such herniated discs "actually heal themselves."

18

In none of the medical records of Davis's visits to her primary care physician, Dr. Fonseca, from February to August 2014, did Davis mention any pain associated with the collision. To the contrary, Dr. Fonseca's examination notes include that Davis's neck was "supple" and that her back was "normal, no tenderness." And, he noted that Davis "denie[d]" having any headaches, joint or muscle pain, or swelling. Further, the evidence shows that Davis, just weeks after the collision, chose to move forward with abdominoplasty, mastopexy, and a liposuction procedure on her thighs, knees, hips, back, and arms. Davis underwent only a single cervical epidural steroid injection in her neck in September 2014, did not return for additional injections as prescribed, and did not seek any further treatment related to the collision from any physician.

With respect to any future pain, Davis testified only that she is "uncomfortable" "some days" and takes ibuprofen "every now and then." She further testified that she did not plan on having any future collision-related treatments, injections, or surgeries and was not under any doctor's supervision or restrictions related to the collision.

It was uniquely within the province of the jury to assess, based on the testimony and evidence, whether the collision caused Davis compensable pain, both past and future. *See Golden Eagle Archery*, 116 S.W.3d at 761. Based on the evidence, the jury could have reasonably concluded that the collision was not severe.

19

*See Gutierrez*, 2008 WL 5392023, at *7 (holding that jury's finding of no damages for pain, suffering, and mental anguish was supported by evidence that collision was minor, damages to plaintiffs' vehicle were minimal, plaintiffs asserted at scene that they were not injured, and plaintiffs did not seek immediate medical treatment). The jury could have chosen to disbelieve that Davis was experiencing significant pain, based on her initial delay in seeking treatment, and the gaps in, and discontinuance of, such treatment, or could have chosen to believe that any pain that she was experiencing was actually attributable to factors other than the collision, i.e., a normal part of the aging process, her participation in rigorous physical activities, and the surgical procedures involving her stomach, chest, back, legs, and arms that she underwent just a few weeks after the collision. *See Huston*, 434 S.W.3d at 641–42; *see also Imamovic v. Milstead*, No. 01-13-01030-CV, 2015 WL 505383, at *6 (Tex. App.—Houston [1st Dist.] Feb. 5, 2015, no pet.) ("[A]lthough appellees admitted fault in the July 2011 automobile collision, the jury heard ample evidence casting doubt on [the plaintiff's] credibility, as well as evidence from which the jury could conclude either that [the plaintiff's] back was not injured or, alternatively, that any injury was caused by earlier or later incidents about which she was not forthright.").

Dr. Berliner and Dr. Kotecha each offered alternative causes of Davis's pain, and the jury was entitled to determine the weight, if any, to give to their testimony. *See id.* at 641 ("When there is conflicting evidence about . . . whether the injuries

20

were caused by the collision, the jury has the discretion to resolve the conflicts, determine which version of the evidence to accept, and refuse to award damages."); *see also Rodriguez v. Browning-Ferris Indus., Inc*., No. 07-06-0368-CV, 2007 WL 2163185, at *3 (Tex. App.—Amarillo July 24, 2007, no pet.) (holding that, although there was objective evidence of injury, jury simply may not have believed that Rodriguez's pain and suffering were due to occurrence in question). A jury is not bound by expert testimony about the cause or extent of a plaintiff's subjective injuries, even when the expert's testimony is uncontroverted. *Imamovic*, 2015 WL 505383, at *6; *see also Ponce v. Sandoval*, 68 S.W.3d 799, 806–07 (Tex. App.— Amarillo 2001, no pet.) ("A jury generally may disregard a doctor's testimony on both the necessity of treatment and on the causation relationship between the accident and the plaintiff's complaints.").

The jury could have decided that Davis should be compensated for seeking initial medical care related to the collision, as it did in awarding her past medical expenses, but that she simply did not suffer pain warranting a monetary award. *See McGuffin*, 732 S.W.2d at 428 (holding that "evidently the jury found appellant's injury so minimal as to not warrant an award for past pain and suffering," despite jury's award of medical expenses for treatment of muscle spasms).

We conclude that the jury's finding of zero damages for past and future pain and suffering, or physical pain, is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

## Past and Future Mental Anguish

To support an award for mental anguish, a party must present either direct evidence of the nature, duration, and severity of her mental anguish, thereby establishing a substantial interruption in her daily routine, or circumstantial evidence of a high degree of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995); *Thomas v. Uzoka*, 290 S.W.3d 437, 455 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). A plaintiff must show more than mere worry or anxiety; there must be proof of "intense pain of body or mind . . . or a high degree of mental suffering." *See Gutierrez*, 2008 WL 5392023, at *7. This can include evidence of "painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings." *Badall v. Durgapersad*, 454 S.W.3d 626, 640 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). To support an award for future mental anguish damages, a plaintiff must demonstrate "a reasonable probability" that she will "suffer compensable mental anguish in the future." *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008).

22

Here, Davis does not direct us to any evidence of a high degree of mental suffering. *See Badall*, 454 S.W.3d at 640; *Gutierrez*, 2008 WL 5392023, at *7. Rather, Davis simply testified that she has anxiety when she rides in cars. *See Gutierrez*, 2008 WL 5392023, at *7 (holding plaintiff must show more than mere anxiety). Further, Davis does not point to any specific evidence establishing a *substantial* interruption in her daily routine. *See Parkway Co.*, 901 S.W.2d at 444; *cf. Badall*, 454 S.W.3d at 640 (holding evidence, i.e., that plaintiff suffered insomnia and heart attack because of stress from incident, and was prescribed medication and hospitalized, was sufficient to establish substantial interruption in daily routine). Davis likewise does not direct us to any evidence of a reasonable probability that she will suffer compensable mental anguish in the future. *See Adams*, 265 S.W.3d at 917.

We conclude that the jury's findings of zero damages for mental anguish, both past and future, are not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### Past and Future Impairment

"Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 554 (Tex. App.—Fort Worth 2006, pet. denied); *see Golden Eagle Archery*, 116 S.W.3d at 772. To recover damages for physical impairment, a

23

party must establish that (1) she incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements and (2) these distinct injuries have had a "substantial" effect on the plaintiff's life activities or functions. *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 514–15 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Unless the separate and distinct loss is obvious, the plaintiff must produce some evidence of tasks or activities that she can no longer perform. *Id.*

Davis testified that, since the collision, her physical activity has "slowed down quite a bit." She cannot walk for long periods of time, which she described as longer than 10 to 15 minutes, because her lower back and ankles "start bothering her." Macias testified that Davis has not been able to exercise "at all" or participate in playing sports or dancing with the family and can no longer take family vacations that involve driving for long periods of time because she feels pain in her back. Macias noted that, at work, Davis is unable to perform her usual filing tasks or carry anything to her car because her back and neck bother her, and she gets "really bad headaches." Hummel testified that, since the collision, Davis can no longer lift weights "like she used to" or run or participate in races because it hurts her back. Hummel testified that Davis "can't sit down for too long" because her back "starts bothering her," and she has a "little bit of neck pain" and "can't do a whole lot of bending or lifting."

The evidence also shows, however, that Davis lost 32 pounds from February to August 2014, which she attributed to the fact that she "ha[d] been exercising." The evidence also includes a Facebook photograph, dated February 20, 2016, depicting Davis carrying her grandchild on her back at a benefit walk. And, Hummel testified that Davis did participate in the walk. The jury was entitled to resolve the conflicts in the evidence and could have chosen to disbelieve Davis, Macias, and Hummel. *See Golden Eagle Archery*, 116 S.W.3d at 761. Davis does not direct us to any evidence of future impairment.

We conclude that the jury's finding of zero damages for past and future impairment is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

In sum, we conclude that the jury could have reasonably concluded either that Davis was not suffering the pain, anguish, or impairment that she alleged or that any such pain, anguish, or impairment was caused by other factors and not caused by the collision. We hold that the evidence is factually sufficient to support the jury's decision not to award Davis damages for past and future physical pain, past and future mental anguish, and past and future impairment.

**Conclusion**

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Caughey.